Bobby and Angie ULLOM *v.* ARKANSAS DEPARTMENT
of HUMAN SERVICES

CA 98-601                                           992 S.W.2d 813

Court of Appeals of Arkansas
Divisions II and III
Opinion delivered June 16, 1999

[Petition for rehearing denied August 25, 1999.]

*F. Lewis Steenken,* for appellants.

*Johnny E. Gross,* for appellee.

JOHN MAUZY PITTMAN, Judge. The appellants in this termination-of-parental-rights case were the parents of a daughter born on August 1, 1996. On August 20, 1996, the child, who was then only twenty days old, was treated for a spiral fracture of her left humerus. The fracture was of unexplained origin, and hospital personnel reported the incident to the Arkansas Department of Human Services (ADHS). ADHS took emergency custody of the child and, following an investigation and probable cause hearing, she was adjudicated as dependent-neglected on September 17, 1996. Following that adjudication, the child remained in foster care and a case plan was developed that required the appellants to participate in counseling, attend parenting class, and continue supervised visitation with the child. Subsequently, a review hearing was held, and appellants' visitation was modified to permit unsupervised visitation in the home.

However, during the first, brief, unsupervised visit on February 8, 1997, the child was again injured and suffered extensive facial bruising. Unsupervised visitation was suspended, and ADHS filed a petition to terminate appellants' parental rights. Shortly thereafter, supervised visitation was resumed, and a hearing on the termination petition was held on May 16, 1997, and January 2, 1998. On January 23, 1998, the trial judge entered an order terminating appellants' parental rights. From that decision, comes this appeal.

For reversal, appellants contend that the findings supporting the trial court's order terminating parental rights were not based on clear and convincing evidence. We find no error, and we affirm.

At the hearing, ADHS argued, *inter alia*, that the termination of parental rights was appropriate under Ark. Code Ann. § 9-27-341 (Supp. 1995), which in pertinent part provides that:

(b) [A]n order forever terminating parental rights shall be based upon a finding by clear and convincing evidence:

(1) That it is in the best interest of the juvenile, including consideration of the following factors:

(A) The likelihood that the juvenile will be adopted if the termination petition is granted, and

(B) The potential harm caused by continuing contact with the parent, parents, or putative parent;

(2) Of one (1) or more of the following grounds:

(A) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months, and, despite a meaningful effort by the Department of Human Services to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent. It is not necessary that the twelve-month period referenced in this subdivision (b)(2)(A) immediately precede the filing of the petition for termination of parental rights, or that it be for twelve (12) consecutive months;

\* \* \* \*

(E)(i) That, subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which

demonstrate that return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors, or rehabilitate the parent's circumstances, which prevent return of the juvenile to the family home.

\* \* \* \*

(F) The juvenile court has found the juvenile victim dependent-neglected as a result of neglect or abuse that could endanger the life of the child, sexual abuse, or sexual exploitation, and which was perpetrated by the juvenile's parent or parents. Such findings by the juvenile court shall constitute grounds for immediate termination of the parental rights of one (1) or both of the parents.

■ ■ Termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well being of the child. *Crawford v. Department of Human Services*, 330 Ark. 152, 951 S.W.2d 310 (1997). Pursuant to Ark. Code Ann. § 9-27-341(b), *supra*, the facts warranting termination of parental rights must be proven by clear and convincing evidence. In reviewing the trial court's evaluation of the evidence, we will not reverse unless the trial court clearly erred in finding that the relevant facts were established by clear and convincing evidence. *Anderson v. Douglas*, 310 Ark. 633, 637, 839 S.W.2d 196 (1992). Clear and convincing evidence is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Id.* Furthermore, we will defer to the trial court's evaluation of the credibility of the witnesses. *Crawford v. Department of Human Services, supra.*

In the present case, appellant Bobby Ullom testified at the probable cause hearing that he, his wife, and the child were at his parents' house the day before he took the child to the hospital. He stated that the child was constantly being handed around at his parents' house, and that his eighteen-month-old nephew and nine-month-old niece were "kissing on her and pulling on her," but that there was always an adult holding and supervising the child. He further stated that no one at his parents' house that day

could recall the child being injured, and that appellants first noticed that something was amiss when she "got fussy" on the way home from his parents' house. According to his testimony, appellants initially believed that the child was suffering from gas, but that she cried all night. He stated that, when he picked the child up the next day, her arm fell, he heard a popping sound, and the child began to scream. Appellants then took the child to a hospital emergency room where the doctor informed them that the child had sustained a spiral fracture and explained that such an injury results when an arm is twisted. Mr. Ullom testified that appellants remained in the hospital all day, spoke with a detective who was investigating the incident, and were told that they would not be allowed to take the child home. Finally, he testified that he did not injure the child and did not know how the injury occurred.

Appellant Angie Ullom's testimony at the adjudication hearing mirrored Mr. Ullom's testimony at the earlier hearing. In addition, she stated that the child could not crawl or grasp objects at the time she sustained the spiral fracture, that the appellants were the only people who had contact with the child on the day the injury was reported, that she had not intentionally injured the child, that she would not allow anyone to injure the child, and that she did not know how the injury occurred.

Appellant Bobby Ullom also testified at the adjudication hearing, essentially repeating his testimony at the probable cause hearing. He added that he had been physically abused by his step-mother when he was a small boy and that he had trouble controlling his anger when he was a child, but stated that he had matured a lot since then. Finally, he stated that his past experiences caused him to resolve that he would never treat his children the way he had been treated.

The termination hearing was conducted on May 16, 1997, and on January 2, 1998. Dr. Barry Allen testified that the child had been in his office on at least eleven occasions. When he first examined her in August 1996, he determined that she had sustained a spiral fracture of the left humerus. He testified that the child did not have any bone disease that would make her more

susceptible to such injuries, that she could not have caused the injury herself, and that it was very unlikely that the injury could have been caused by an eighteen–month–old child or by someone picking up the child. He further testified that the primary cause of spiral fractures to children under the age of three was abuse, that no other explanation had been proposed that would explain the injury, and that he believed that it was very likely that the spiral fracture was the result of child abuse.

Dr. O.L. Henderson testified that he saw the child in the emergency room in August 1996. He explained that a spiral fracture usually occurs because a torsional force has been applied to the bone, and that most spiral fractures in children under the age of three occur because someone has twisted the child's arm. He testified that these injuries are generally not accidental and that, in children of this age group, the injury would have to have been caused by someone else. Although he could not categorically rule out the possibility that the spiral fracture had been caused by an eighteen–month–old toddler, he stated that it was very unusual for an eighteen–month–old to break the bone of another child, that picking up a newborn by the arm would not cause this type of injury, and that breaking a long bone in this manner would require quite a bit of force and violence. He also testified that a child injured in this manner would begin crying uncontrollably and could not be consoled. Finally, he testified that, although the child's injury could have resulted in nerve damage, blood vessel damage, and loss of the limb, the possibility of loss of life was very remote.

Dr. Charles Akin testified that he saw the child on February 8, 1997, when she was brought in for evaluation of bruising around the face. He testified that the child had fresh, blue bruises about the left brow, left eye, the left side of the nose, and the cheek, and that she had the same bruises on the right side of her face to a lesser degree. He further testified that he examined the toy that allegedly had fallen on the child's face and stated that, dropped from a height of six inches, the toy could not have caused bruises of the type sustained by the child. He stated that, dropped from a height of six inches, the toy would have caused a more isolated mark, if any, and that, even had the toy been rammed into

the child's face, it would have caused a less diffuse and more isolated pattern of bruising.

Christy Evans, the child's foster mother, testified that when she picked up the child following the unsupervised visitation on February 8, Mr. Ullom was waiting with a toy in his hand. She testified that Mr. Ullom told her that he had been sitting on the floor next to the child when she reached up and pulled the toy out of his hand, and that the toy hit her in the face. She testified that she examined the child and noticed bruising across one whole side of her face, small bruises on the other side, and darkening on the back of her head that looked like a bruise.

Angie Ullom also testified at the termination hearing. Much of her testimony regarding the spiral fracture injury was in reiteration of her testimony regarding that incident at the previous hearing. Significant additions to her testimony regarding that incident included her statement that, on August 21, 1996,[1] the child had been crying intermittently but was sleeping when Mr. Ullom came home in the evening. She stated that, as she went into the kitchen to get a bottle for the child, she saw Mr. Ullom pick up the child out of her chair. She testified that he blocked her vision of the child as he bent down, and that the child screamed. Regarding the bruising incident, Mrs. Ullom stated that Mr. Ullom was holding a toy over the playpen, that the child reached up for the toy, and that the toy hit the child's face. She testified that she made six telephone calls on February 8 regarding the injury, but that she did not telephone ADHS because she was afraid they would take the child away from her. She also stated that she would do anything to get the child back, and that she and Mr. Ullom had done everything that ADHS had asked them to do. She further stated that they had attended counseling sessions, parenting classes, and visitation with the child, and that they continued to attend counseling and visitation even after being informed that ADHS intended to move to terminate their parental rights.

---

[1] While Ms. Ullom testified that these events occurred on August 21, other evidence indicates that they occurred on August 20. The exact date is not significant to our decision.

The termination hearing was concluded on January 2, 1998. Heather Bailey testified that she began working on the Ullom case in September 1996, and continued as caseworker through July of 1997. She stated that, following the investigation of the toy incident and the determination that it was another act of abuse, the goal of the case plan changed on March 24 from reunification to termination of parental rights and adoption. She testified that the revised case plan was shown to the Ulloms, but that they did not sign it. She further testified that the agency continued to work toward reunification and to provide services to appellants even after March 24: visitation continued, the parents were required to maintain employment, and Mr. Ullom was required to attend anger-control counseling. She stated that appellants continued to be cooperative even though they knew that the ADHS goal was now termination of parental rights.

Melissa Bratton testified that she took over the Ullom case on July 9, 1997. She stated that she considered reunification to be the goal even though appellants had been told that ADHS would pursue termination in the absence of a valid explanation for the child's injuries. She stated that a case plan was drawn up on October 15 that had reunification as its goal. She further stated that reunification would be an attainable goal if a plausible explanation for the child's injuries were offered, even if that explanation consisted of an admission that one of the parents intentionally harmed the child.

Bobby Ullom also testified. The chief distinction between Mr. Ullom's prior testimony was that, on this occasion, he stated he no longer believed that the child's arm had been broken by his nephew.[2] Instead, he testified, he now believed that the child's

---

[2] Mr. Ullom testified as follows:

This is my third time to testify in [this] matter. At the time I told the Court that [the child] had been fussy the night before she went to the hospital, I think that at the time she was not in pain. The next morning I went to work, at the time Angie was in the recliner and [the child] was sitting on her chest. When I came home for lunch Angie said that [the child] was better, but she was still pretty fussy. I went back to work after lunch, I came home about 4:00. When I came home [the child] was in the bouncy seat and Angie went to fix her a bottle. I reached down to pick [the child] up out of the seat, and I believe that was when her arm may

arm was broken when it became entangled in a safety strap as he attempted to remove her from her chair. He conceded that this differed from his earlier testimony, and that he had not mentioned entanglement in the safety strap to physicians or investigators following the incident. He also testified that he had had a problem with violent outbursts while in elementary school, and that he had been suspended for fighting during the tenth grade. He could not recall whether or not he was expelled from high school, but he stated that he believed that the counseling he participated in had corrected his previous problem with controlling his anger.

■ For reversal, appellants contend that the findings supporting the order of termination were not based on clear and convincing evidence. They first argue that the evidence was insufficient to support a termination order based on Ark. Code Ann. § 9-27-341(b)(2)(A) (Supp. 1995) because the evidence failed to show that the child had continued out of the home for one year, or that ADHS had made a meaningful effort to rehabilitate the home and correct the conditions that caused removal. We do not agree. The child was adjudicated dependent-neglected on September 17, 1996. The termination hearing began on May 16, 1997, and concluded on January 2, 1998, and the termination order was not entered until January 23, 1998. Consequently, at the time the hearing was concluded, the child had in fact "continued out of the home for one year" as required by the statute, and any error that may arguably have resulted from the filing of the termination petition before the statutory period had elapsed was thereby cured. *See Donna S. v. Arkansas Department of Human Services*, 61 Ark. App. 235, 966 S.W.2d 919 (1998).

■ Nor can we say that the evidence was insufficient to support a finding that ADHS made a meaningful effort to rehabilitate the home and correct the conditions that caused removal. The evidence, particularly the medical evidence that the child's injuries simply could not have occurred in the manner appellants say they did, clearly supports a finding that one or both of the parents intentionally abused the child, and that both of the parents

---

have gotten caught under the strap. I didn't tell the Court that I thought her arm had been caught under the strap in the previous hearings.

intentionally concealed the abuse by giving false histories of the origins of the injuries. The evidence also shows that, to remedy the situation, ADHS provided parenting classes, counseling sessions, and anger counseling for Mr. Ullom, and continued to provide services aimed at reunification up to the final day of the hearing. Although it is readily apparent that such services will be of little use if the parents conceal the source of the abuse by providing false histories of the origins of the child's injuries, that is a circumstance wholly within the control of appellants and it does not render the attempts to remedy the situation unmeaningful. It is, under Ark. Code Ann. § 9-27-341(b)(2)(A) (Supp. 1995), ultimately the parents' duty to remedy the conditions causing removal and, under the circumstances of this case, we think that the trial judge could properly find that they failed to do so despite a meaningful effort by ADHS to rehabilitate the home.

■ Nor do we agree with appellants' argument that there was no evidence that appellants manifested any incapacity or indifference to remedy the subsequent issues or factors that demonstrate that return of the child to the family home would be contrary to the child's health, safety, or welfare, and that removal therefore was improper under Ark. Code Ann. § 9-27-341(b)(2)(E)(i) (Supp. 1995). Appellants argue that they have complied with all the requirements imposed on them by ADHS and have accepted responsibility for the child's injuries. This argument, however, ignores the evidence supporting the trial judge's express finding that the injuries were perpetrated by appellants. Appellants have stated that they accept responsibility, but they accept responsibility only for accidental injuries of problematical origin when the great weight of the evidence indicates that those injuries were intentionally inflicted at a time when only appellants were present with the child. Appellants have indeed complied with the case plan but, even after they began attending parenting classes and counseling sessions, the evidence shows that the child was injured on the very first occasion that appellants were allowed unsupervised visitation, and a medically impossible explanation was again given for the child's injuries. The evidence of the extreme youth of the child when the abuse was begun, and the evidence that the abusive behavior was resumed at the first

opportunity even after the child was removed from the home, demonstrates that return of the child to the family home would be contrary to the child's health, safety, and welfare. Furthermore, appellants' continued denial of personal responsibility and efforts to conceal the source of the abuse demonstrate that they have manifested the incapacity or indifference to remedy the subsequent issues. *See Corley v. Arkansas Department of Human Services*, 46 Ark. App. 265, 878 S.W.2d 430 (1994). We hold that the evidence in this case was sufficient to support termination of appellants' parental rights, and we affirm.

Affirmed.

MEADS, J., agrees.

ROGERS, J., concurs.

BIRD, STROUD, and ROAF, JJ., dissent.

JUDITH ROGERS, Judge, concurring. I join with the majority to affirm the trial court's decision to terminate parental rights. This is a very troubling case because this course of action is not to be taken lightly. Because of the tender age of the child, the opportunity of the trial judge to assess the weight and credibility of the evidence and observe the parents, and the unreasonable action of the parents in not seeking immediate aid for this baby until after calling relatives and their attorney, I conclude that the child must be protected and removed from this home.

I am concerned, however, with the Department of Human Services' inadequate pursuit of intensive early reunification efforts. Given the teaching of child experts that abuse suffered as a child is one predictor of abuse and violence committed as an adult and given the abusive history and violence of the father as testified to in the record, I must conclude that serious intensive efforts should have been made on behalf of this family by DHS.

SAM BIRD, Judge, dissenting. I respectfully dissent from the prevailing decision, which affirmed the trial court, because I do not believe that the evidence clearly and convincingly supports the chancellor's conclusion that appellants abused

their child or that any other ground exists for the termination of appellants' parental rights.

The trial court appears to have concluded that there was clear and convincing evidence to support three grounds for granting the petition to terminate the appellants' parental rights:

> (1) that [the child] was dependent-neglected as a result of unexplained abuse or neglect that could endanger the life of the child and was perpetrated by the juvenile's parents;

> (2) that subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrate that the return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and that, despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors, or rehabilitate the parent's circumstances, which prevents return of the child to the family home; and

> (3) that the juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months, and despite a meaningful effort by the Department of Human Services to rehabilitate the home and correct the conditions which caused the removal, those conditions have not been remedied by the parent. It is not necessary that the twelve-month period referenced in this subdivision (b)(2)(A) immediately precede the filing of the petition for termination of parental rights, or that it be for twelve (12) consecutive months.

The first of these "grounds" is not a basis for the termination of parental rights, either under Ark. Code Ann. § 9-27-341 (Supp. 1995), that was in effect at the time of the filing of the termination petition, or under the amendment, Ark. Code Ann. § 9-27-341 (Supp. 1997), that became effective during the pendency of this action. Although injuries that are at variance with the history given are defined in Ark. Code Ann. § 9-27-303(4)(b)(i) (Repl. 1998) as abuse, the mere occurrence of an injury to a child, the cause of which is unexplained, is not a basis that the legislature has determined to be a ground for the termination of parental rights.

Although the second ground relied upon by the trial court for terminating appellants' parental rights is contained in Ark. Code Ann. § 9-27-341(b)(2)(E)(i) (Supp. 1995), as well as in the 1997 amendment (Ark. Code Ann. § 9-27-341(b)(2)(G)(i) (Repl. 1998)), there is simply no evidence in the record that supports termination on that ground. The court's order does not identify the "other factors or issues" that arose subsequent to the filing of the petition, but this is apparently a reference to the incident on February 8, 1997, when appellants had the child in their home for a day of unsupervised visitation and, according to appellants, the child's face was bruised when she was struck by a plastic toy that dropped out of Bobby Ullom's hand into her playpen, striking her in the face.

Even assuming that the occurrence of this incident was a sufficient factor or issue to demonstrate that the return of the child to her family was contrary to her health, safety, or welfare, there was no evidence that, "despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors, or rehabilitate the parents' circumstances." To the contrary, all evidence on this point clearly demonstrates that the appellants had done everything that the court and ADHS had asked of them, including maintenance of stable employment and housing, strict adherence to their visitation schedule, successful completion of parenting classes, and anger-management counseling. There is certainly no evidence to support a finding that the appellants manifested the "incapacity or indifference" to remedy the problems that resulted in the child's removal. Heather Bailey, the caseworker for ADHS assigned to the Ullom case, even testified at the termination hearing that, as the goal of DHS's case plan, she advised in favor of reunification of the child with appellants.

Finally, I disagree with the conclusion of the prevailing judges that the evidence was sufficient to establish by clear and convincing evidence that termination was appropriate under Ark. Code Ann. § 9-27-341(b)(2)(A) because the child had not been out of appellants' home for twelve months, either when the termination petition was filed or when the hearing thereon was commenced.

The dates applicable to this case are not disputed. ADHS first took custody of the child at the hospital on August 20, 1996, following the diagnosis of the spiral fracture to her left arm. The child was adjudicated to be dependent-neglected on September 17, 1996, less than thirty days after ADHS took custody of her. ADHS's petition for termination of parental rights was filed on February 18, 1997, only five months following the dependency-neglect adjudication, and the hearing on the termination petition was begun on May 16, 1997, less than nine months after custody of the child was placed in DHS custody. After five witnesses testified on behalf of ADHS, the hearing was recessed, to be reconvened on July 29, 1997. However, the July 29 hearing did not materialize, and the matter was subsequently reset for, and concluded on, January 2, 1998.

It is obvious from the dates set forth above that the hearing for termination of appellants' parental rights was begun before the child was out of appellants' home for twelve months. In fact, the record reflects that five out of ADHS's seven witnesses testified at the hearing on May 16, 1997, including the three medical doctors whose testimony was relied upon by ADHS to prove that the child had been abused. The prevailing judges conclude that, although the termination hearing began only nine months after the child was removed from appellants' home, any error that may have resulted was cured because the hearing was not *concluded* until after the lapse of twelve months from the child's removal from appellants' home. They rely on *Donna S. v. Arkansas Dep't of Human Servs.*, 61 Ark. App. 235, 966 S.W.2d 919 (1998), to support this proposition.

Assuming, arguendo, that *Donna S.* is a correct interpretation of § 9-27-341(b)(2)(A), it is distinguishable from the case at bar. In *Donna S.* we affirmed the termination of parental rights upon a petition that was filed before the required twelve months out of home had lapsed, but where the termination hearing was not *conducted* until *after* the children had been out of the parent's home for fourteen months. In the case at bar the hearing was conducted, in substantial part, less than nine months after the child's removal from appellants' home. Applying the reasoning of the prevailing judges, a hearing on a petition for termination of parental rights

could be commenced immediately after the removal of a child, and the twelve-month out-of-home requirement of § 9-27-341(b)(2)(A) will have been satisfied so long as one last witness is left to testify after the lapse of twelve months. I disagree because such reasoning nullifies the obvious purpose for the twelve-month out-of-home requirement.

The requirement for a twelve-month lapse before the consideration of a petition for removal of a child from its parents' home is obviously intended to allow ADHS a reasonable period of time to "make a meaningful effort . . . to rehabilitate the home and correct the conditions that caused the removal . . . ." In fact, this purpose is expressed in § 9-27-341(a) where it is stated that "[t]he intent of this section is to provide permanency in a juvenile's life in all instances where return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that return to the family cannot be accomplished in *a reasonable period of time*." For the purposes of § 9-27-341(b)(2)(A), I believe the legislature has said that twelve months of meaningful rehabilitation efforts after removal of the child from its parents' home is a reasonable period of time that must elapse before the court may consider a petition for termination of parental rights.

It is hard for me to believe that, after embarking on a course intended to terminate the Ulloms' parental rights and to place the child for adoption, ADHS was motivated to exert much of an effort to rehabilitate the Ulloms' home or to correct the conditions that caused the child's removal. In fact, the record does not reflect that ADHS did anything to accomplish a goal of reunification after February 8, 1997, except to permit supervised visitations, and these visits were only permitted because, according to Heather Bailey, "[w]e have to provide visitation until the day of termination." All other reunification efforts, including parenting-skills training, counseling, anger management, etc., were completely abandoned when the termination petition was filed.

I also disagree with the prevailing judges' characterization and interpretation of some of the evidence presented at the termination hearing. For example, in summarizing the testimony of

Dr. Barry Allen, the prevailing opinion states that he testified that the spiral fracture suffered by the Ulloms' child was "very likely . . . the result of child abuse." However, the prevailing judges do not mention that in a letter to the Benton County Department of Human Services in December, 1996, Dr. Allen stated, "[t]he fracture is consistent with maltreatment syndrome, however other etiologies for this fracture cannot be eliminated at this time." This report indicates quite clearly that almost four months after the occurrence of the fracture, causes other than abuse had not been eliminated by Dr. Allen.

It is apparently significant to the prevailing judges that Dr. Allen testified that he had seen the child on "at least eleven occasions," presumably to emphasize how many times she required medical attention. However, they fail to point out that four of those occasions were on four consecutive days, including the day appellants brought the child to the emergency room with the fracture to her arm, and that two of the occasions (February 17 and March 11, 1997) were follow-up visits relating to the bruises on her face. The record is silent as to the dates and purposes of the other five visits, but they obviously did not relate to any alleged incidents of abuse by appellants because at all times subsequent to August 20, 1996, except for the one unsupervised visit on February 8, 1997, the child was in the custody of ADHS.

I also disagree with the prevailing judges' interpretation of the testimony of Dr. O.L. Henderson when they attribute to Dr. Henderson a statement that "a child injured in this manner would begin crying uncontrollably and could not be consoled." However, the prevailing opinion fails to give the context surrounding Dr. Henderson's statement. An examination of the abstract reveals that this statement was actually developed during appellants' cross-examination of Dr. Henderson when he stated that:

> In this age group, an adult picking a child up whose limb is trapped in some way could apply enough force to easily break the arm. There would certainly be a tug, you would notice the resistance. At that point the child would start crying, uncontrollable crying, and you could not console the child.

The prevailing opinion fails to point out that this description by Dr. Henderson is entirely consistent with the testimony of appellant Bobby Ullom that when he picked up the child from her "bouncy seat," he heard a loud "popping sound, like a finger would pop," then the child's arm "fell back" and she let out a loud scream. Bobby immediately took the child into the kitchen and showed Angie Ullom what was wrong with her arm, and they took her to the emergency room. The prevailing opinion also makes no mention of Dr. Henderson's testimony on direct examination that "[u]sually when this fracture occurs there is a noticeable pop when the bone breaks."

I believe that the prevailing opinion has also misconstrued the testimony of Dr. Henderson when it stated that the doctor "testified that, although the child's injury could have resulted in nerve damage, blood vessel damage, and loss of the limb, the possibility of loss of life was very remote." Here, again, the prevailing opinion has taken Dr. Henderson's statement out of context, thereby attributing to the doctor a meaning neither stated nor intended by him. The abstract reveals that the doctor actually said:

> This injury would be a one-incident occurrence which would have worsened by not taking her to the hospital, and moving it around, but was not a life threatening injury. This type of injury could have caused nerve and blood vessel damage *if untreated, and further dislocated by moving it around. At that point* it could have resulted in the loss of a limb. The possibility of loss of life would be very remote. (Emphasis added.)

It is obvious from this exact quote that the risk of nerve and blood-vessel damage, and loss of limb, existed *only if the injury went untreated and became further dislocated by moving it around,* circumstances that did not exist in this case. Bobby Ullom testified that he picked up the child from her "bouncy seat" and heard the "popping sound" after he came home from work at about 4:00 p.m. Angie Ullom testified that Bobby came home from work between 4:00 and 4:30, and that they took the child to the emergency room at about 5:00 p.m. Dr. Allen testified that he first examined the child in the emergency room during the evening of August 20, 1996, although the time of her admission to the emergency room is not revealed by the abstract. Dr. Henderson even

testified that, from his examination, he determined the blood vessels were not ruptured, that the fracture was not displaced, and that the injury had occurred "fairly recently." Never has ADHS contended that the appellants failed to seek timely and appropriate medical care for the child following the discovery of her injury.

The prevailing judges also suggest that Bobby Ullom's testimony at the probable-cause hearing and his testimony at the termination hearing were inconsistent, thereby implying that he was less than truthful in his inability to explain how the child's injury occurred. Again, an analysis of the context of Bobby's testimony points up the fact that there is no inconsistency. At the probable-cause hearing, in response to questions by appellee's counsel about the circumstances that led to the child's trip to the emergency room, Bobby Ullom delivered a lengthy dissertation of the events of the two days that preceded that occasion. He recounted that on the day before, they had been at his parents' house where their baby was the center of attention, with between ten and twenty relatives handling and passing her around, including an eighteen-month-old nephew and a nine-month-old niece, constantly kissing and pulling on her. He said that while the child would be sitting in an adult's lap, the eighteen-month-old nephew was especially persistent in walking over and tugging on her arms in an effort to pull her down where he could kiss her. Bobby recalled that he had just bought a truck that day and that he and Angie had been in and out of the house all day, working on the truck.

Bobby testified that at about 9:30 p.m., when the child started getting "fussy," they headed for home. He stated that when they put the child in her car seat she was real fussy and screaming, but they paid little attention because they thought she was just experiencing gas. When they got her home and put her in her crib, they noticed that she could not lie on her left side at all, that she slept very little during the night, and that Angie was up with her all night long. When he got up to go to work the next morning, Angie was still up with her, and he noticed that the baby would only sleep when Angie held her to her chest, "immobilized where she couldn't move." He stated that when he came home after work, Angie told him that when she picked the child up she noticed that she was holding her left arm differently than she did

before, and differently than she held her right arm. Bobby said that he also noticed that while sitting in her "bouncy seat," the child's left arm was "laid to the side," differently than she usually positioned it.

Bobby stated that while Angie went in the kitchen to get the child a bottle, he picked her up from the "bouncy seat" by sliding one hand under her bottom and the other hand under her neck, and that when he lifted her, her left arm "just kind of fell," she screamed, he heard a popping sound "like whenever you would pop your finger," and that when he wiggled her arm, she screamed even louder. He said that he immediately showed Angie, they both started crying, and they rushed her to the emergency room.

Significantly absent from Bobby's testimony during the probable-cause hearing is the statement attributed to him by the prevailing opinion that he "believed the child's arm had been broken by his nephew."[1] However, the prevailing judges undertake to draw a comparison between his nonexistent testimony at the probable-cause hearing and his testimony sixteen months later at the termination hearing by implying that he now believed that his child's arm was broken when it became entangled in a safety strap as he attempted to remove her from her chair.

To test the validity of the prevailing judges' comparison, it is also necessary to examine in detail Bobby's testimony at the termination hearing. At that hearing, after briefly reiterating the events of the day, Bobby stated that he had thought about the incident for a long time, and that he did then believe that when he picked up his child from her "bouncy seat" and heard the "popping" sound, he knew then that something was wrong but that he was so stunned by her screaming that he was only paying attention to her welfare. He now believed that the velcro strap that held her in the chair had only been opened on one side, but should have

---

[1] Although the prevailing opinion sets forth in a footnote a portion of the testimony of Bobby Ullom, it should be noted that this testimony is taken from the termination hearing. The prevailing opinion reveals no testimony of Bobby Ullom from the probable cause hearing to the effect that he believed his baby's arm was broken by his eighteen-month-old nephew.

been opened on both sides. He said that it was only after he and Angie had had a long time to think about it and to review their actions of the day leading up to the discovery of the fracture that they were able to come up with the logical explanation.

He admitted that he had not testified earlier about the child's arm being caught in the chair because at the earlier hearing he was relating the events leading to the discovery of her injury and was not thinking about an explanation for it. However, it is little wonder that at the termination hearing Bobby's concentration turned from a mere recitation of events to an explanation of the cause of the child's fracture, considering the inexplicable (and, in my opinion, highly inappropriate) action of the trial judge in writing a letter to the parties' attorneys advising the parties that "without acceptance of responsibility by someone (especially for the broken arm) reunification is not likely to occur." According to the record, this letter was written after several witnesses had already testified *for* ADHS at the termination hearing but *before* any witnesses had testified for appellants. In fact, according to Melissa Bratton, one of appellants' ADHS caseworkers, the appellants were told that this "accept-responsibility-or-else" requirement contained in the judge's letter thereafter became a part of the case-management plan as a condition of reunification. In view of the judge's letter that, as a condition of reunification, "someone" must accept responsibility for the child's broken arm, and the inclusion of this requirement in ADHS's case plan, it becomes readily apparent why Bobby's testimony (which came months after the judge's letter was written) shifted from a general description of events over a two-day period to a description of a specific incident (lifting the child from her "bouncy chair" without unfastening the velcro strap) as the "logical explanation" for her arm fracture. Bobby was obviously doing exactly what the judge and ADHS had stated would be required as a condition of reunification, accepting responsibility for the child's fracture.

The majority opinion contains the statement that "the great weight of the evidence indicates that [the child's] injuries were intentionally inflicted at a time when only appellants were present with the child." I disagree. The only evidence offered by ADHS as to the cause of the child's injuries was the testimony of the

doctors who stated that although the child's injuries are of the type usually associated with abuse, other etiologies could not be ruled out. There is absolutely no evidence to support the proposition that appellants or anyone else intentionally injured the child.

I would be remiss in not taking the time to comment on the concurring opinion of Judge Rogers in which she sets forth her reasons for joining in affirming the trial court. In her concurring opinion, Judge Rogers states, as one reason for her affirmance, her concern about "the unreasonable action of the parents in not seeking immediate aid for this baby." I am at a complete loss to understand the basis for this concern because, as already noted, there was neither an allegation nor was any evidence presented by ADHS that the Ulloms delayed in taking their baby to the hospital emergency room after the discovery of her injury. I am equally puzzled by Judge Rogers' reference to the failure of ADHS to pursue intensive early reunification efforts in view of the "abusive history and violence" of Bobby Ullom. I find no basis in the evidence to support a conclusion that Bobby Ullom has a history of abuse or violence beyond his own admission that twelve or thirteen years ago, as a child in elementary school, he had trouble controlling his anger, and that he once got an in-school suspension in the tenth grade for fighting. I hardly find these incidents sufficiently troubling to justify labeling Bobby Ullom as abusive or violent.

In my view, this is a sad case where a three-week-old baby has been permanently removed from the home of her parents for no other reason than that she was injured in two unfortunate accidents, and the speculation that the injuries were caused by one or both of her parents upon the testimony of doctors that such injuries are usually, but not necessarily, the result of abuse. Such evidence falls far short of the requirement of Ark. Code Ann. § 9-27-341(b), which states that orders for the termination of parental rights must be based on a finding of clear and convincing evidence.

Although I believe the decision of the chancellor should be reversed outright, in view of the lapse of almost three years since the appellants and their child have had any significant time

together, I would reverse and remand this case to the trial court with instructions to direct ADHS to resume its reunification efforts with all due deliberation.

STROUD and ROAF, JJ., join in this dissent.