Amanda TROUT *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 03-332 146 S.W.3d 895

Court of Appeals of Arkansas
Divisions III and IV
Opinion delivered January 28, 2004

[Petition for rehearing denied March 3, 2004.[8]]

---

* PITTMAN and BIRD, JJ., would grant rehearing.

*Barbara A. Ketring-Beuch*, for appellant.

*Gray Allen Turner*, for appellee.

*Gail Laster*, attorney *ad litem.*

ANDREE LAYTON ROAF, Judge. Amanda Trout appeals from the trial court's order terminating her parental rights to two of her children, D.T. and W.T. On appeal, Trout argues that the trial court erred in (1) terminating her parental rights against the weight of the evidence presented at the termination hearing and (2) terminating her parental rights as to W.T. but because the child had not been out of the home for a period of one year. We reverse and remand.

During most of these proceedings, Amanda Trout was married to Andrew Trout, from whom she is now divorced. Amanda is the mother of three children, E.D., D.T., now four, and W.T., now two. Her older son, E.D., was living with his grandmother because he was afraid of Andrew, who had once thrown him across a room. Andrew, who is the father of W.T., had his parental rights terminated in the same hearing, but he does not appeal.

Amanda first became involved with DHS in 1999, when Andrew's son, J.T., was placed into DHS custody and declared dependent-neglected due to environmental neglect because the home was filthy. Amanda began receiving services at this time, including individual counseling and parenting classes. In December 2000, Amanda's infant son, D.T., was also placed into DHS custody due to allegations of sexual abuse against Amanda with regard to J.T. The allegations were not proven, and both children were returned to the Trouts in March 2001. However, further incidents ensued, including an altercation between Amanda and Andrew in March in which Amanda allegedly threw J.T. out of the car and left Andrew and J.T. to walk four miles home. DHS again removed J.T., and both Amanda and Andrew were arrested at this time for outstanding warrants unrelated to this case. D.T. was also

placed into DHS custody at that time because there was no one left to care for him.

At the May 24, 2001 adjudication hearing, the trial court found that Andrew had abused J.T. by slapping him and that D.T. was at risk of harm from Andrew given his previous treatment of Amanda's older son. The court also found that Amanda and Andrew had engaged in emotional abuse by cursing at each other and then forcing the child to walk four miles home, and by engaging in physical altercations and other acts in their home in front of J.T. and D.T. Relying on both their prior behavior and their psychological evaluations, the court found that Amanda and Andrew were unfit parents and that D.T. was dependent-neglected. The goal was set as reunification, and the court ordered that both parents undergo counseling and anger-management therapy.

A permanency planning hearing was held on December 11, 2001. At the hearing, the evidence showed that while Amanda had not fully complied with the case plan or court orders, she had a baby, W.T., in September 2001, and had heart problems for which doctors were attempting to stabilize her medication. Amanda was unemployed and was also still married to Andrew, although she testified that she was no longer living with him. Amanda testified that she had missed some visitations because of health problems. Amanda's DHS caseworker testified that there was a potential for reunification if Amanda complied with the court orders and became stable enough to care for her children.

Several review hearings were conducted in the ensuing months. At the January 2002 review hearing, the evidence showed that Amanda had divorced Andrew, had been awarded full custody of W.T., and had attended most of her visitations with D.T. However, she was still unemployed. Amanda testified that she had not been attending counseling or anger-management classes because she was waiting on Medicaid approval. Amanda stated that Andrew had not been to her home, and that she had met Andrew at a restaurant in order to get a child-support payment from him and to give him a copy of the divorce papers. The caseworker stated that Amanda's home was suitable, and was the cleanest home she had seen since working on the case, that Amanda had plenty of food, and that her utilities were on. Amanda stipulated to W.T.'s adjudication as dependent-neglected at this hearing because of her prior problems with maintaining a stable place to live.

In the March 2002 review hearing, the evidence established that Amanda had maintained a stable home and had attempted to attend therapy. She was still unemployed; however, the DHS caseworker testified that Amanda's visitation had been consistent, that she had not had any contact with Andrew to her knowledge, that she had been trying to comply with the case plan and court orders, and that her stability was much improved. The caseworker recommended that Amanda begin having unsupervised and weekend visits with D.T., in preparation for returning him to the home in July, and recommended reunification with both children.

However, in May 2002, W.T. was placed into DHS custody because of environmental conditions in Amanda's home on a visit and because Amanda was believed to have allowed Andrew to have contact with the children. After Amanda began weekend visits with D.T., DHS received two complaints from the daycare facility that D.T. was dirty after returning from his visits and had a cut on his ear and scars on his knees. D.T. had told his foster parent that Andrew had pushed him down and pulled his ear. DHS went to Amanda's home in May to discuss the reports and to check the home for safety. The caseworker testified that the home smelled and that there was trash in the kitchen, a cat litter box in the living room, car parts and dogs in the yard, and fans running in W.T.'s room. The caseworker recommended that W.T. remain in DHS custody and that Amanda's weekend visits with D.T. be suspended. Amanda denied that she had returned D.T. to daycare dirty. She also denied that Andrew had been staying there, although she did testify that she had a male roommate to help out with the bills. Amanda testified that she saw Andrew about once a week and that she borrowed his car, although they usually met at Wal-Mart.

At the planning hearing in August 2002, employees from D.T.'s daycare facility testified about the earlier incidents in April when D.T. had returned from weekend visits dirty and with a skinned knee. Amanda had been in a car accident in June while riding with Andrew and had lost an unborn child. Amanda had completed parenting classes, but had not been participating in counseling; she had visited D.T. and W.T. regularly. According to her caseworker, Amanda was not in compliance with the case plan or court orders at that time, and she now recommended termination of Amanda's parental rights.

Amanda testified that she bought a trailer and a car with part of her $10,000 settlement from the automobile accident. She

explained that she had trouble participating in counseling because of a delay in her Medicaid approval and that she could not afford to pay for therapy herself because she had cardiology expenses. Amanda testified that she now had reliable transportation and that she had put in several job applications. She also stated that she had worked at Denny's for a short time as a waitress, but could not continue because of her health problems. Amanda testified that she had gone back to school but that they had also sent her home because of her medical problems. She further testified that she would have enough money to get through the next eight months if she did not have to pay any medical bills.

At the final review hearing in October 2002, there was additional testimony that Amanda had missed a counseling appointment. Her caseworker recommended that Amanda's parental rights be terminated based on the history of the case and the parents' lack of compliance. She further testified that she had been to Amanda's new home and that it was neat and clean. W.T.'s pediatrician testified that W.T. had been diagnosed as "failure to thrive" and had worsened since being in foster care. Amanda testified that she still did not have a job but that she was working with an agency that helps disabled persons to find jobs. According to Amanda, she had missed the counseling appointment because she thought they would be closed since it was a holiday. Amanda testified that she had not seen Andrew, except at the DHS office, and that she had rectified the situation for which her children were removed, primarily her relationship with Andrew and her housing and utility problems.

The termination hearing was held in November 2002. There was once again testimony about the conditions in Amanda's home back in May when W.T. had been taken into DHS custody. An adoption specialist with DHS testified that there were available families willing to adopt D.T. and W.T. and that the likelihood of their adoption was very great. Amanda's caseworker testified that she had been the caseworker since 1999, and that Amanda had been offered individual and family counseling, parenting classes, employment services, and home-based services. She testified that, to her knowledge, Amanda had not been to counseling. She also stated that Amanda was still looking for employment. She conceded that Amanda's new home was suitable for children; however, she testified that she did not know if Amanda could maintain stability without assistance. The caseworker further testified that DHS had provided services for three years and that Amanda would comply, but then would "fall by the wayside." She testified that it

was troubling that Amanda has continued to maintain contact with Andrew.

Amanda testified that she had been employed at Waffle House for three days, although if that job interfered with her job-training program at Arkansas Rehabilitative Services, she would have to quit. She further testified that she had been to two counseling sessions with her new therapist and had undergone an anger-management assessment. She stated that she was now on blood-pressure medication and could work. Amanda testified that her mobile- home lot rental was paid up for four months in advance and that she would be able to pay for her utilities and food due to her new job. Amanda stated that she had remedied most of her problems while continuing to work on the rest, and that the settlement money had helped her start over. She stated that Andrew was out of her life for good and that she was working hard to make sure that she did not make the same mistakes in the future.

Following the hearing, the trial court found clear and convincing evidence to terminate Amanda's and Andrew's parental rights. The court took judicial notice of the prior terminations with respect to Andrew's three other children. The court also took into consideration Amanda's psychological evaluation from May 2001, in which she was diagnosed as having an adjustment disorder, a personality disorder, and borderline intellectual functioning. The psychologist had at that time recommended that she receive counseling, anger management, and parenting classes, as well as find a job, before reunification should take place. However, the psychologist also stated that Amanda was in an "abusive relationship" with Andrew, and that he could not recommend returning D.T. to the home because it "will be filled with chaos, arguing, physical altercations, and inconsistent discipline." The trial court also found that Amanda continued to associate with Andrew even after both children were placed into foster care and questioned her credibility, noting that she had spent all of her settlement money from the accident and "was again relying on the charity of others to pay her bills." The court further stated that it would not give a lot of weight to "eleventh-hour improvements," and that Amanda had not had a sufficient length of stability to indicate a reasonable likelihood that she would get D.T. and W.T. back in her home in the foreseeable future. The court found that it was in both children's best interests to terminate Amanda's parental rights because she was still an unfit mother and there was little likelihood that services to the family would result in successful reunification. This appeal ensued.

On appeal, Amanda argues that the trial court erred in terminating her parental rights against the weight of the evidence presented at trial. Amanda contends that the trial court erred because she had complied with the majority of the court's orders and was addressing her employment situation at the time of the termination hearing. She asserts that the trial court should have allowed her more time to continue with reunification efforts and to prove that the changes she had made were permanent.

The rights of natural parents are not to be passed over lightly; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). A trial court's order terminating parental rights must be based upon findings proven by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2002); *Ullom v. Arkansas Dep't of Human Servs.*, 67 Ark. App. 77, 992 S.W.2d 813 (1999). Clear and convincing evidence is defined as that degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established. *Ullom, supra*. On appeal, the appellate court will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Brewer v. Arkansas Dep't of Human Servs.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001). Also, this court defers to the trial court's evaluation of the credibility of witnesses. *Ullom, supra*.

Amanda's parental rights were terminated pursuant to Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2002), which states that an order terminating parental rights shall be based upon a finding by clear and convincing evidence *that is in the best interest of the juvenile*, including consideration of the likelihood of adoption and the potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent. The order terminating parental rights also must be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). The applicable grounds relied upon by the trial court in this case are:

> (i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve

(12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent.

\*\*\*

(ix)(a) The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to:

(3) Have subjected the child to aggravated circumstances.

According to Ark. Code Ann. § 9-27-303(6)(A) (Repl. 2002), "aggravated circumstances" means that a child has been abandoned, chronically abused, subjected to extreme or repeated cruelty, or sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification. In this case, the trial court found that there was little likelihood that services to the family would result in successful reunification of Amanda and either D.T. or W.T., as well as finding that her parental rights as to D.T. should be terminated under section 9-27-341(b)(3)(B)(i)(a).

Amanda first came to the attention of DHS during her marriage to Andrew Trout. Her son D.T.'s placement in DHS custody initially arose as a result of an altercation between Amanda and Andrew in March 2001, and W.T., born in September 2001, was taken into custody in May 2002 based upon the conditions in Amanda's home on a visit, and also because it was suspected that Amanda had allowed Andrew to be around the children. Although Amanda had made substantial improvements prior to the time of the termination hearing in November 2002, the trial court stated that it was not required to consider "eleventh-hour" improvements. At the time of the termination hearing, D.T. had been in DHS custody for approximately nineteen months and W.T. approximately five months. Although reunification with D.T. had been recommended by DHS at both the January and March 2002 review hearings, DHS's recommendation changed to termination at the August 2002 permanency planning hearing, based substantially on its prior involvement with Amanda during the pendency of the case involving Andrew's children, the visit to Amanda's home in May, and reports by D.T.'s daycare workers.

We do not agree that the evidence in this case shows only "eleventh-hour" improvements by Amanda. Amanda's older child, D.T., came into DHS custody during the spring of 2001 when Amanda was in the midst of what the psychologist described

as an abusive relationship and when she was apparently well into a pregnancy with her youngest child, W.T. Her testimony about significant ongoing medical problems was not contradicted. In the course of less than a year, Amanda completed parenting classes, began rehabilitative services, obtained an appropriate home and transportation, addressed her medical problems, and obtained employment, and commenced counseling. Amanda did experience a setback in her progress in May 2002, based on a single visit to her home and on reports by daycare workers that D.T. returned from visits dirty and with skinned knees. However, her home was otherwise described very favorably throughout the duration of this case, including subsequent to the May 2002 incident. Moreover, DHS witnesses testified that they had no knowledge of Andrew's presence in Amanda's home after August 2001. Amanda was never ordered to not have contact with Andrew in any event. While the trial court's comments suggest that Amanda had squandered the funds received from the accident settlement, she in fact acquired a home, automobile, and paid her lot rental months in advance in the effort to achieve stability.

■■ The trial court characterized Amanda's progress as "eleventh-hour" improvements that he was not required to consider, apparently in reference to Ark. Code Ann. § 9-27-338(9)(4)(B)(iii) (Repl. 2002), which provides:

> A parent's resumption of contact or overtures toward participating in the case plan or following the orders of the court in the months or weeks immediately preceding the permanency hearing are insufficient grounds for retaining reunification as the permanency plan.

This provision pertains to the permanency planning hearing, which occurred back in December 2001, after which reunification was and continued to be the goal in this case until the May 2002 hearing, a proceeding from which Amanda was never allowed to recover. Moreover, the evidence reflects continuous and steady progress by Amanda in addressing her problems. Given the foregoing, we cannot conclude that the trial court's decision to terminate her parental rights based on her failure to remedy the conditions causing removal is supported by clear and convincing evidence. Since the trial court's finding of aggravated circumstances was likewise predicated solely upon a finding of little likelihood that services would result in successful reunification, this ground must also fail. Consequently, we need not address Amanda's second argument that the trial court erred

in terminating her parental rights as to W.T. because the child had not been out of the home for a period of one year.

Since we are not privy to what has occurred since the last hearing date in November 2002, we express no opinion as to whether or when custody should be returned to Amanda. In fact, the correct outcome of this litigation may still involve the termination of her parental rights; however, any such determination must be based upon clear and convincing evidence that a statutory requirement for termination has been met. We leave that decision to the trial court upon remand of this case.

Reversed and remanded.

HART, ROBBINS, and VAUGHT, JJ., agree.

PITTMAN and BIRD, JJ., dissent.

JOHN MAUZY PITTMAN, Judge, dissenting. I respectfully dissent from the majority's decision to reverse the trial court's order terminating appellant's parental rights to her two young children.

At the time of the final hearing in this case, one of appellant's children had been out of the home for over twelve months and the other for less than twelve months. The case began when the oldest of these children was removed because of allegations of sexual and physical abuse against another child in the home. It was found that the charges of physical abuse against this child were meritorious, and that the father posed a danger to all of the children. As the case proceeded, appellant's home was found to be unsanitary in the extreme, so environmental abuse was added as a condition to be rectified.

A new child was born, and was included in the case plan and removed from the home for a time as a result of one of the chaotic and frequently violent episodes that characterized the lives of appellant and her husband. Appellant eventually divorced her husband, completed some of the court-ordered counseling, and obtained new housing. However, there was evidence that appellant maintained frequent contact with her ex-husband and exposed the children to him, including one episode where the ex-husband, driving despite a long-suspended license, was involved in a car wreck that resulted in the death of appellant's unborn child. There was also evidence that she did not complete the court-ordered counseling or employ reasonable efforts to do so within the time allotted, and that her unsanitary and unhealthy living habits had followed her to her new housing. Accordingly, the trial judge

terminated her parental rights to the two children, and this appeal followed.

For reversal, appellant contends that there was insufficient evidence to terminate her parental rights to the eldest child; that the trial judge exhibited bias against her; and that the trial court erred in terminating her parental rights to the youngest child, who had not been out of the home for twelve months. I would affirm.

Although termination of parental rights is an extreme remedy in derogation of the natural rights of the parents, it is equally true that parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Wade v. Arkansas Department of Human Services*, 337 Ark. 353, 990 S.W.2d 509 (1999). The question before us is whether the trial court clearly erred in finding that there was clear and convincing evidence of facts warranting termination of parental rights. *Johnson v. Department of Human Services*, 78 Ark. App. 112, 82 S.W.3d 183 (2002).

I believe the evidence clearly supports a finding that several significant new factors arose after the filing of the petition, including appellant having willfully maintained contact with and exposed the children to danger from her ex-husband who, it appears, preferred to give up custodial rights and visitation rather than participate in anger-management therapy. That appellant flagrantly continued her relationship with her ex-husband is tragically demonstrated by the death of appellant's unborn child during the pendency of these proceedings, while appellant was riding in a car driven by her ex-husband. There was also evidence that, although appellant and her child-abuser ex-husband were ostensibly separated, they were frequently seen together in town by ADHS employees, and that, on one occasion, appellant's ex-husband answered the telephone at her residence one morning and told the caller appellant was asleep. This evidence of continued contact is extremely significant, especially in light of evidence that, after appellant and her ex-husband were divorced, appellant's son was seen with cuts and scars and told a family service worker that his father pushed him down and pulled his ear.

The evidence also supports a finding that the environmental neglect was not remedied. Given the long span of time that appellant had been working on these problems with only transitory improvement, I think that the trial judge could also properly find that appellant manifested the indifference or incapacity to remedy the issues causing removal of her eldest child.

The bulk of appellant's brief is devoted to allegations that the

trial judge was biased. However, there is no indication that she raised the issue below, and the issue of judicial bias is not preserved for appellate review where appellant neither objects to any statements made by the trial judge nor moves for the judge's recusal. *Nichols v. State*, 69 Ark. App. 212, 11 S.W.3d 19 (2000).

Finally, given the evidence supporting termination of appellant's parental rights with respect to her eldest child, it is clear that the trial court acted properly in terminating her parental rights to her youngest child. A twelve-month period outside the home is unnecessary under several circumstances, including cases where the parent is found by a court of competent jurisdiction to have had his parental rights involuntarily terminated as to a sibling of the child, Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(4); or where, subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrate that return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances which prevent return of the juvenile to the family home. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a).

We have often stated that there are no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. *See, e.g., Mason v. Mason*, 82 Ark. App. 133, 111 S.W.3d 855 (2003). In matters involving the welfare of young children, we give great weight to the trial judge's personal observations, *Johnson v. Department of Human Services, supra,* and in resolving the question of whether the trial court clearly erred in finding that facts existed warranting termination of appellant's parental rights, we are obliged to give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Id.* The reason for this heightened standard of deference is that the trial judge had an opportunity that we do not have, *i.e.,* to observe the litigants and determine from their manner, as well as their testimony, their sincerity, their apparent interest, and their affection, or lack of affection, for the child. *See Qualls v. Qualls*, 250 Ark. 328, 465 S.W.2d 110 (1971).

Giving the trial judge's superior opportunity the deference to which it is entitled, I cannot agree that he clearly erred in finding that facts existed warranting termination of appellant's parental rights.

BIRD, J., joins in this dissent.