Jamie LONG *v.* ARKANSAS DEPARTMENT of HEALTH
& HUMAN SERVICES

CA 05-306                                        237 S.W.3d 529

Court of Appeals of Arkansas
Opinion delivered June 28, 2006

[Rehearing denied August 23, 2006.]

*DeeNita D. Moak*, for appellant.

*Gray Allen Turner*, Office of Chief Counsel, for appellee.

JOSEPHINE LINKER HART, Judge. Jamie Long appeals from an order of the Pulaski County Circuit Court terminating her

parental rights to her daughter K.L. and son M.S. On appeal, she argues that the trial court erred in finding sufficient evidence to terminate her parental rights. We reverse and remand.

On February 27, 2003, Arkansas Department of Human Services (DHS) took Long's children into custody after she was arrested on drug charges relating to her use of methamphetamine. At the time, K.L., and M.S., were five and two years old, respectively. On April 25, 2003, the children were adjudicated dependent-neglected.

Initially, Long was not compliant with the requirements of the case plan. At the first review hearing, the trial court found that Long had not complied with its orders and the case plan services in that she had not submitted to the court-ordered psychological evaluation, failed to complete parenting classes, no longer attended NA/AA meetings at Celebrate Recovery, arrived late for visitation with her children and, contrary to the direction of DHS, brought people to the visits. The trial court did note, however, that Long did have a drug- and-alcohol assessment, "some visitation," and "some random drug screens." At an October 30, 2003, review hearing, the trial court found that Long still had not completed parenting classes and had not visited the children since September 8, 2003. The trial court ordered Long to continue to submit to random drug screens, visit the children "regularly," and "continue intensive outpatient substance abuse treatment." It also imposed a requirement that Long "have a stable home and employment and demonstrate that she can properly provide for her kids."

In its February 26, 2004, permanency-planning order, the trial court found that Long had complied with the court orders and case plan, and it continued to order reunification services. Additionally, the court awarded Long weekend visitation.

On March 19, 2004, the trial court entered an emergency *ex parte* order modifying the visitation to twice weekly at the DHS offices. The visitation was changed on March 16, 2004, after the foster mother, Mrs. Cherry, informed DHS that the children had not been returned on time from the weekend visit. This order remained in place even though Long informed DHS that the late return was caused by her hospitalization due to complications with her pregnancy.

At the next permanency-planning hearing, held on May 20, 2004, the trial court rejected DHS's recommendation that reunification remain the goal and *sua sponte* ordered a termination hearing. In that order, the trial judge stated: "I understand she's

pregnant. I am concerned about the fact that she's pregnant and having some problems. I'm not unsympathetic to that, but mom does not seem to have understood the priorities that she should have on this case." She further noted that Long had not provided the drug treatment sign-in sheets that she had been directed to submit. Nonetheless, the trial judge ordered reunification services to continue.

At the September 15, 2004, termination hearing, Dr. Paul Deyoub, a psychologist, testified that he administered a psychological evaluation to Long. He stated that Long admitted to using methamphetamine "four or five times," marijuana, "some alcohol," and pain medication. Long told him that she was currently living with a man from Mexico named Mario, whom she planned to marry when her DHS case was over. He noted that she had Mario's name tattooed on both sides of her neck, but he opined that it was consistent with her personality in that it reflected impulsiveness and poor decision making. Dr. Deyoub further opined that Long's involvement with Mario also reflected poor judgment in that he was a "big priority for her." According to Dr. Deyoub, Long's testing revealed some degree of personality disorders, with traits of Borderline, Histrionic, and Dependent disorders indicated. Long's I.Q. was 88. He noted that Long had an unstable life, having been abandoned by her parents to a group home for six years "for no apparent reason" after her parents divorced. Later, Long tried to live with her mother when she was fifteen, received in-patient treatment at Rivendell and Turning Point, and had, since age seventeen, tried to make "it as best she can with relationships" that failed but had produced two children. He opined that her prognosis for reunification was "very guarded and poor . . . although not impossible." Dr. Deyoub noted a trend of past dependence on males in relationships and stated that "Mario is an unknown. I have no idea what this individual is all about. So that's just one more factor that I don't know about, but that the Court has to see who is this person."

Jan Kucala, a licensed counselor, certified play therapist, and program manager for the Centers for Youth and Families in Jacksonville testified that she counseled K.L., beginning on January 13, 2004. She stated that the child had "a lot of anxiety and worry about family matters and concern about what was going to happen to her, what was happening to her mother." Ms. Kucala stated that Long had made progress, that she was much more aware of K.L.'s feelings, that she was "very open" about mistakes that she

had made, and that she showed "a lot of insight" into how her separation from her children has damaged her relationship with them and what she would need to do to repair that relationship. Ms. Kucala noted as well that, at times, there was confusion as to who K.L.'s case worker was and noted that there were several appointments for which DHS had failed to bring the child. She reported that being out of the home was "very stressful" on K.L., that K.L. felt "punished" because she was in foster care, and that there was a "very strong bond" between K.L. and her mother.

Further, Ms. Kucala opined that if Long's rights were terminated, "regression will probably occur on [K.L.'s] part," and while she declined to offer an opinion regarding termination because her agency did not encourage them to make this type of judgment, she did state that she thought that "the family had been making progress," and K.L. had not been prepared "in any way" for termination of her mother's parental rights. Regarding Mario, Ms. Kucala stated that his involvement had been limited, but she was aware that Long and Mario had an agreement that Long would be able to stay home with the children while Mario supported the family, and Mario affirmed that commitment. Nonetheless, she stated that she did not think that it would be prudent to put the children "totally in their mom's home today," but noted that the "kids are very bonded to her" and she did not believe that the reunification process "would be a long-term thing." She recommended that the trial court order unsupervised visitation.

Long testified that she currently lived in a one-bedroom apartment, but she had signed a transfer with the management company and paid fees to allow her to move into a larger apartment that would accommodate the return of her children. She stated that Mario's take-home pay was four to five hundred dollars per week. She admitted to testing positive for opiates the previous August, but attributed it to the Tylenol 3 that she had been prescribed. She admitted that she moved to Georgia for three or four months in 2003, but when she found that transferring her case there would be a "long process," she returned to Arkansas. She stated that she moved there because Mario was able to make more money. Nonetheless, while she was away, she claimed that she called her children regularly.

Regarding her substance-abuse problems, Long claimed that she was not "addicted in any way to any controlled substance" when she had her assessment because she had just been in jail for two-and-a-half months. Since getting out, she went to Celebrate

Recovery for drug meetings, AA meetings every day for a month "to keep busy doing things on the positive level," and UAMS Adult Psychiatry for individual counseling. She also claimed to have attended Narcotics Anonymous at Saline Memorial Hospital. Long admitted that she was slow to provide the documentation of her attendance at the various therapy sessions, but claimed that no one told her that her documentation was inadequate. Long noted that she had been assigned to take five drug screens since May of that year, and while she missed one, all except the August 9, 2004, screening when she was taking Tylenol 3 as prescribed, had been negative.

Long noted that the caseworkers had changed quite a bit during the pendency of her case. She recalled that Angela Haynes, Carolyn Williams, Bonnie Twillie, and Tamika Floyd had all been assigned her case at various times, and she stated that confusion as to who was handling the case had affected her visitation. She recounted having difficulty finding out who her caseworker was at several key times.

Long stated that she had a long-term relationship with Mario Cirilo and that they planned to marry once she got her kids back home. She claimed that she was working very hard to get her children back. Nonetheless, she admitted that Mario was "a priority," and she disputed that it was bad judgment to try to have a baby while her children were in DHS custody. Long stated that the reason she had failed to get her children back to the foster-parent's home on time after her last weekend visit was that she was hospitalized. She claimed that she provided DHS caseworker Carolyn Williams with "some proof" she had been in the hospital, but admitted it was "the wrong one." Long also conceded that she had not provided documentation to DHS proving that she had been employed at McDonald's.

Tamika Floyd, one of the four caseworkers that had worked with Long's children, testified that Long was aware of the require-ment that she receive drug treatment and that she provide proof that she was getting drug treatment; that she submit to random drug testing showing that she was "clean"; that she maintain steady employment and stable housing; and that she attend NA meetings and provide DHS with the proof of attendance. Floyd stated that Long tested positive in August for opiates and positive for pro-poxyphene on May 18. Floyd stated that Long also missed one drug screen, claiming "she forgot." Floyd claimed that she "never saw any proof [Long] completed drug treatment." Floyd admitted

that Long gave her sign-in sheets for NA meetings in August, July, and May, and told her that the sign-in sheets for June were at her sister's house. However, Floyd claimed that she was only able to "confirm" attendance at two meetings in July and that she had no proof that Long attended individual counseling. Floyd further admitted that she received a letter from Long's father verifying that he paid Long to take care of her grandmother, but never received "pay stubs."

Floyd stated that Long "began to comply" with the case plan requirements, but noted that some elements still needed work, including the requirement that she maintain a stable home environment—Floyd stated Long's one-bedroom apartment was not large enough to accommodate her children. She further stated that the NA sign-in sheets are "somewhat questionable." Regarding the services that DHS provided to Long, Floyd listed "a drug and alcohol assessment, counseling services with [K.L.], psychological assessment, and random drug screens." She also claimed that transportation services were "offered" along with visitation with the children, "services" for M.S. at Pediatric Specialty Care, foster care, and medical and dental services. Floyd stated that she believed that Long knew her case worker, but admitted that there was considerable shuffling of the case among several workers in the office. Regarding individual counseling, Floyd stated that Long had told a previous case worker, Williams, that Long was receiving counseling at UAMS and "there's no notation that the counseling was deficient and more counseling was needed." Floyd also stated that she visited Long's current one-bedroom apartment, and she saw that there was "food in the refrigerator, the lights were on, and it was clean," and "fully furnished."

In its termination order, the trial judge found that "there is a potential that these juveniles would be harmed by continuing contact with the mother." It further noted that there was "great potential for emotional harm to these juveniles if they had continued contact with a mother who has not placed them first and foremost in her priorities so that she can be there for them all day, every day, and provide for all their needs." Additionally, the trial judge found that Long "has not demonstrated that she can remain drug free, have stability in housing and employment, and make appropriate decisions that do not negatively affect [the children's] well being." She noted deficiencies in the documentation that Long was ordered to provide.

On appeal, Long argues that the trial court erred in finding that there was sufficient evidence to terminate her parental rights. She contends that she "substantially complied" with the orders of the trial court and corrected the problems that caused the removal of her children. Long notes that she was ordered to submit to ten drug screens, and she never tested positive for methamphetamine, the use of which caused her children to be taken into custody. She further notes that she completed parenting classes, attended visitation, participated in a psychological evaluation, completed a drug and alcohol assessment, attended outpatient drug counseling at Celebrate Recovery, attended individual counseling at UAMS, and obtained a place to live and an adequate means of support. Long asserts that she met the three objectives required of her at the permanency-planning hearing: visit her children, continue in therapy with her daughter, and attend AA or NA meetings once a week and provide documentation of those meetings to the caseworker.

The grounds for termination of parental rights must be proven by clear and convincing evidence. *M.T. v. Arkansas Dep't of Human Servs.*, 58 Ark. App. 302, 305, 952 S.W.2d 177, 179 (1997). When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). This court reviews termination of parental rights cases de novo. *Id.*

█ It is clear that Long substantially complied with the requirements imposed upon her by the court. As the trial judge recites in her order, Long was required to do "three main things: attend AA or NA meetings once per week and provide documentation to the caseworker every month; make her priority to visit the juveniles without fail; and continue in therapy with [K.L.] so that she could learn how to help [K.L.] alleviate her anxiety and better parent [K.L.] with her issues." With the exception of providing documentation, Long fulfilled all of these requirements. Given the extraordinary progress Long has made in fulfilling the requirements of the court, the overwhelming evidence of the very

strong bond between mother and children, and the testimony from K.L.'s therapist that the child would "regress," we hold that the trial court was clearly erroneous in finding that Long's continued contact with her children would be detrimental. Accordingly, the best interest of the children dictates that we reverse the termination of Long's parental rights and reinstate reunification services with a goal of returning the children to Long's custody.

Reversed and remanded.

ROAF, VAUGHT, and GLADWIN, JJ., agree.

CRABTREE and GLOVER, JJ., dissent.

TERRY CRABTREE, Judge, dissenting. The trial court in this case terminated appellant's parental rights nineteen months after the children had been removed from her care. There was evidence presented at the termination hearing that appellant had yet to comply with the most basic requirement of the case plan, which was to satisfy the court that she had come to terms with and had overcome her recognized drug problem. There was also evidence that she had yet to achieve the level of stability necessary for the children's return to her care, in that she had not maintained stable employment nor had she obtained suitable housing. The stability of her home was also complicated because of uncertainties arising from her relationship with her current boyfriend. Because I am not left with the definite and firm conviction that the trial court was mistaken in its judgment, I would affirm the termination decision.

On February 28, 2003, the children were taken into emergency custody after appellant was arrested on charges of possession of methamphetamine, possession of drug paraphernalia, and two counts of endangering the welfare of a child. Appellant failed to appear at the review hearing held the following July. In its ruling from that hearing, the trial court found that appellant was not in compliance with the case plan in that she had missed three appointments for a psychological evaluation; she had not completed parenting classes; and she was not attending AA/NA meetings as required. At the subsequent review hearing in October, it was disclosed that appellant had moved to Georgia. Again, it was found that appellant was not in compliance with the case plan, and the trial court warned appellant that the permanency-planning hearing was upcoming and urged appellant to bring herself into compliance. At this juncture, eight precious months had passed

since the children had been taken from her home, but appellant had not yet begun to engage in the process of facilitating their return home.

The permanency-planning hearing was held in February 2004. At this hearing it was shown that appellant was beginning to make progress toward the goal of reunification. In late December 2003, she had returned to Arkansas from her three-month sojourn in Georgia; she had completed parenting classes; she had regularly visited with the children; and a drug screen taken in January came back negative, as did a drug screen conducted the day of the hearing. Appellant was living with her sister and had a job interview at McDonald's. Appellant, however, had not completed outpatient drug treatment, nor had she been attending AA/NA meetings. Though the children had been out of the home for one year and could not be returned home, the trial court continued the goal of reunification because of the measurable progress appellant had made, giving her three more months to bring herself into compliance. Appellant was also granted unsupervised weekend visitation. However, this visitation was suspended after a month when appellant failed to return the children on time. Appellant offered the explanation that she had been hospitalized and was thus not able to return the children on time, but appellant never provided the court with documentation of her stay in the hospital, despite her representation that she possessed such documentation.

At the permanency-planning review hearing held in May 2004, after the three-month grace period, it was disclosed that appellant was still not attending AA/NA meetings. As before, appellant had provided no documentation that she was receiving outpatient drug treatment. She had inexcusably missed one drug screening. Since the last hearing, she had only attended three visitation sessions with the children. It was said that appellant had not maintained regular contact with the department. Further, it was disclosed that her criminal charges remained outstanding. Based on this evidence, the trial court decided to change the goal from reunification to termination, noting in particular that the children had been taken into protective custody over drug usage and that appellant had not complied with the case plan in that area. Even though appellant excused her lack of visitation on the basis that her caseworker had changed and that it had not been made clear to her when her visits were to occur, the trial court was not required to accept that any such confusion extended over an entire three-month period. Although the majority is critical of the trial

court's "*sua sponte*" decision not to accept the department's recommendation to continue the goal of reunification, it was the trial court's prerogative to change the goal to termination, despite that recommendation. Ark. Code Ann. § 9-27-338(c) (Supp. 2005). The decision rests with the trial court, not the department.

At the conclusion of this review hearing, the trial court offered appellant words of encouragement, advising her that changing the goal to termination was not the "death knell" and that there was still time to bring herself into compliance. Unfortunately, the testimony presented at the termination hearing, held some three months later, revealed that appellant did not take advantage of the additional time. There was testimony that she tested positive on May 19 for propoxyphen, also known as Darvon, that she had missed a drug screening in July, and that she had tested positive for opiates in August. She did not present satisfactory proof verifying her attendance at NA meetings. She provided one unsigned sign-in sheet for May, none for June, four unsigned sheets in July, and four unsigned sheets in August. Her attendance at only two meetings in July could be confirmed. Other than her own word, she provided no documentation that she had participated in or completed outpatient drug counseling. It should be noted that appellant represented throughout the proceedings, and to Ms. Kucala, K.L.'s counselor, that she had been receiving treatment on her own at UAMS.

Jim Pfeiffer, a licensed professional counselor and certified drug-abuse therapist, testified[1] that he performed a drug and alcohol assessment on appellant in May of 2003, while appellant was incarcerated on the drug charges. In the interview, appellant told him that she used drugs and that she drank alcohol sparingly, even though she admitted to having a DWI a year and a half ago. She said that she had smoked marijuana one time and that she had used methamphetamine four or five times, but that her drug of choice was hydrocodone. Appellant reported that she had been using this drug for five years on an average of four to five pills a day, twenty to thirty pills per month. Pfeiffer said that appellant did not believe that she needed treatment because she had experienced

---

[1] When the record was being prepared, the court reporter discovered that her equipment had malfunctioned and that Pfeiffer's testimony had not been recorded. The trial judge's clerk prepared a summary of his testimony from the judge's notes. By entry of an agreed order, the summary was accepted by the parties and the court as a fair representation of his testimony.

no cravings since her incarceration. Appellant stated that she traded methamphetamine for hydrocodone, but Pfeiffer said that she did not consider trading as dealing in drugs.

Dr. Paul Deyoub, a forensic psychologist, conducted an evaluation of appellant in September of 2003. He diagnosed appellant with a mixed personality disorder with Borderline, Histrionic, and Dependent traits. He said that this disorder was characterized by substance abuse, instability, and unstable and abusive relationships. Noting that appellant had been in and out of court on hot-check and contempt charges, as well as her more recent drug arrest, he said that trouble with the law also typified her personality disorder. Dr. Deyoub stated that appellant had no insight into her substance-abuse problem and that she tended to minimize it. He felt that she was at risk for continued drug use and regarded her prognosis for reunification as being guarded and poor, although not impossible. Dr. Deyoub said that one could not believe appellant's promises of improvement and that one would have to see evidence of improvement before the children could be returned. He testified that appellant must demonstrate to her caseworker that:

> she is drug free, living in a home, working, supporting herself, not using drugs and doing her therapy. All of that would have to happen before. At the time I did this, and in cases like this which I do a lot of these, you're looking at six months to a year and she would be able to verify those steps. Because individuals like her and specifically [appellant] would have a high likelihood of recurrence or positive drug screens and so forth and all of that would be a set back. You would have to see it before you could place the kids back with her and put two young children with her if she's still using drugs or if she's still living an unstable life. People like [appellant] with a diagnosis and with her IQ are capable of doing this. That's not the problem. The problem is doing it.

Jan Kucala did testify that appellant had made progress since the last hearing, that the children were very bonded to her, and that K.L. would probably regress if appellant's rights were terminated. However, Ms. Kucala also stressed K.L.'s overriding need for stability, which was a need that appellant could not presently fulfill. She testified that achieving stability was going to be a "great difficulty" because there were still a lot of unknowns in the relationship between appellant and her boyfriend. She could not recommend that the children return home, only that a trial period

of unsupervised but closely monitored visits in the home begin. She was not able to predict how long it would take before appellant became stable enough for the children to return home, saying only that she did not think it would be a "long-term thing."

There was further testimony at the hearing that, although appellant had been asked, she had never provided pay stubs to verify her four-month employment at McDonald's. Appellant claimed that she was presently working for her father caring for her aged grandmother. There was testimony that her caseworker could not verify appellant's claim that she was moving into a larger apartment.

An overview of this case reveals that appellant waited ten months to begin working toward the goal of reunification, that she maintained partial compliance for five months, and that she made no meaningful progress and in fact regressed in the final months of the proceedings. At the termination hearing, the trial court was entitled to accept Dr. Deyoub's testimony outlining the necessity for documented proof, not appellant's word, that she was meeting the goals of the case plan of living a stable and drug-free life, and of maintaining employment and suitable housing. The trial court could find based on the evidence at the hearing that appellant had not successfully dealt with her drug problem, which was the reason that the children were removed from the home. Appellant could not verify that she had attended drug counseling or NA meetings on a regular basis. Just prior to the termination hearing, she had failed two drug tests and had failed to attend one drug screening. Although appellant testified that she had tested positive for opiates because of prescribed medication, appellant did not offer any verification of this prescription, and the trial court was not obliged to believe her testimony. There was also testimony at the hearing that called into question whether or not appellant was or even had been gainfully employed. Appellant failed to provide proof of employment, and the trial court was not required to believe her testimony that she was currently employed by her father. There was testimony giving the trial court reason to doubt that appellant had made arrangements for an apartment that could accommodate the children. Moreover, after nineteen months, appellant had not achieved the level of personal stability necessary for the children to return home. According to Ms. Kucala, there was much work yet to be done, and she could not say when appellant would be ready for the children to return home on a permanent basis. Although Ms. Kucala expressed the opinion that K.L. would regress if

appellant's rights were terminated, the trial court was entitled to accord whatever weight to that testimony as it saw fit, and could properly focus on the overall best interest of the child in the context of all the evidence under consideration.

It is always a sad day anytime a trial judge makes the tough and unenviable decision that the best interest of children demands the termination of parental rights. On appellate review, we are to give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it. *Trout v. Ark. Dep't of Human Services*, 359 Ark. 283, 197 S.W.3d 486 (2004). With that degree of deference in mind, I am not willing to say that the trial court's decision is clearly erroneous. In this case, the seasoned trial judge had the best opportunity to observe appellant, as well as the other witnesses, and to make an informed assessment of the situation gathered over the course of nineteen months. The trial judge took the case under advisement in order to render a careful and thoughtful decision. It is my opinion that we should not second-guess the judgment of the trial court when there is an abundance of evidence to support its decision. I would affirm, and I am authorized to state that Judge Glover joins in this dissent.