Amanda TROUT *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

04-207                                    197 S.W.3d 486

Supreme Court of Arkansas
Opinion delivered November 4, 2004

*Barbara A. Ketring-Beunch*, for appellant.

*Gray Allen Turner*, for appellee.

TOM GLAZE, Justice. This case involves an order of the trial court terminating appellant Amanda Trout's parental rights with respect to her two children, Dakota and Winter Trout.[1] After a series of hearings, the trial court determined that Amanda was an unfit parent for a variety of reasons, including her failure to comply with the court's directions regarding family and marital counseling, anger management therapy, and other matters. The court of appeals reversed the trial court's decision, see Trout v. Arkansas Dep't of Human Servs., 84 Ark. App. 446, 146 S.W.3d 895 (2004), and the Arkansas Department of Human Services ("ADHS") petitioned for review from that decision, which we granted. Upon a petition for review, we consider a case as though it had originally been filed in this court. Dinkins v. Arkansas Dep't of Human Servs., 344 Ark. 207, 40 S.W.3d 286 (2001).

█ We begin by noting that, when the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. Bearden v. Arkansas Dep't of Human Servs., 340 Ark. 615, 12 S.W.3d 208 (2000). Termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. Id. Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Crawford v. Arkansas Dep't of Human Servs., 330 Ark. 152, 951 S.W.2d 310 (1997). Parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. J. T. v. Arkansas Dep't of Human Servs., 329 Ark. 243, 947 S.W.2d 761 (1997). On appellate review, this court gives a high degree of deference to the trial court, which is in a far superior position to observe the parties before it. Dinkins, supra; Davis v. Office of Child Support Enforcement, 341 Ark. 349, 20 S.W.3d 273 (2000).

With these standards in mind, we turn to the facts of this case. The present case began in 1999, when ADHS filed a petition for emergency custody against Andrew and Christine Trout, the parents of Jonathyn Trout, who was born on April 6, 1997. That

---

[1] The trial court's order also terminated the rights of Amanda's ex-husband, Andrew Trout, regarding Winter; however, Andrew has not appealed, and the only part of the trial court's termination order before us is that portion dealing with Amanda and her two children.

petition alleged that Jonathyn was dependent-neglected, primarily due to environmental neglect. The trial court declared Jonathyn dependent-neglected at an adjudication hearing held April 6, 1999, and ordered a plan of reunification. After that adjudication, Christine and Andrew divorced, and Andrew married appellant Amanda Trout. On May 21, 1999, Amanda gave birth to a son and named him Dakota Trout; however, Andrew was not Dakota's biological father.

Following a number of permanency planning hearings with respect to Jonathyn, the trial court eventually authorized ADHS to proceed with the filing of a petition for termination of Andrew's parental rights, although ADHS was also ordered to continue to provide reunification services until a hearing could be held on the petition. On August 14, 2000, ADHS filed a petition for termination of Andrew's parental rights with respect to Jonathyn. At a hearing, the court was not persuaded that Andrew's parental rights should be terminated. Therefore, the court authorized a gradual plan of reunification where Jonathyn would be permitted increased visitation into Andrew and Amanda's home, with a full return of custody to take place on January 1, 2001.

In December of 2000, however, ADHS filed a petition for emergency custody against Amanda and Andrew with respect to Dakota, alleging that Dakota was at risk of being sexually abused by Amanda. At the same time, ADHS filed a motion for *ex parte* emergency change of custody with respect to Jonathyn, alleging the same danger of sexual abuse. After hearing evidence on the allegations, the trial court declared that it was not convinced or persuaded that Jonathyn had been sexually abused. The court dismissed the petitions for emergency custody regarding Dakota and Jonathyn, and entered an order returning the boys to Amanda's custody on March 2, 2001.

Dakota and Jonathyn returned to live with Amanda in early March 2001. On March 15, 2001, Andrew slapped Jonathyn so hard he left red discolorations and finger marks on the boy's face. On March 27, 2001, Andrew and Amanda became embroiled in a screaming, cursing fight in the parking lot of the Wal-Mart where Andrew worked; Amanda left then-four-year-old Jonathyn at Wal-Mart with Andrew with no way for them to return home other than walking. After this incident, ADHS filed a petition

seeking anadjudication that Dakota was dependent-neglected.[2] Following an adjudication hearing held on that petition on May 24, 2001, the trial court entered an order finding that Andrew's striking of Jonathyn constituted excessive physical discipline and abuse. The court further found that Dakota was at risk of harm from Andrew, based on the excessive discipline Andrew used on Jonathyn. The court also found that Andrew and Amanda's fight at Wal-Mart constituted emotional abuse, and in addition, it further found that Andrew and Amanda had engaged in physical altercations in front of the children at home.

Based on the evidence and testimony, the court found that neither Amanda nor Andrew was a fit and proper parent. In support of this conclusion, the court pointed to the Trouts' psychological evaluations, Andrew's violence towards his son and his "threatening and violent behavior in the past," and the fact that Andrew "has engaged in highly inappropriate activities, such as having sexual relations with a woman not his wife while his wife was in the same bed." Given the "highly chaotic lifestyle and lack [of a] wholesome nourishing environment that children need," the court found Dakota to be dependent-neglected. The court found both boys to be in need of ADHS's services, and placed Jonathyn and Dakota in ADHS custody. The court also ordered individual and family therapy for Andrew and Amanda, including marital counseling and anger management therapy. Nevertheless, the goal of the case was determined to be reunification.

At a permanency planning hearing on July 12, 2001, ADHS family service worker Jaime Penn testified that ADHS had a permanency plan for Dakota of adoption, but wanted to make that concurrent to the goal of continued reunification efforts. Penn further stated that the Trouts had moved into a new home, but that Amanda was not working; Amanda was, however, taking classes at Pulaski Technical College. Amanda gave birth to Winter Trout on September 6, 2001.

The court held another permanency planning hearing on December 11, 2001. In an order entered after that hearing, the court found that Amanda was still not complying with the court's

---

[2] Police were requested to conduct a child-welfare check after receiving a report that Amanda had thrown Jonathyn out of the car. Although that claim was ultimately never substantiated, Amanda and Andrew were arrested on outstanding warrants on March 27, 2001. At that time, both Jonathyn and Dakota were taken into ADHS custody.

orders regarding the case plan; she had not participated in her counseling sessions, and she was living in hotels because she had not paid the utilities at her home. The court noted that she was unemployed and was still married to Andrew, "a man who has had his parental rights terminated as to three of his children, in part due to his abuse of one of Mrs. Trout's children." The court stated that it would not return Dakota to Amanda so long as Andrew was in the home.

The next hearing was held on January 22, 2002. At that time, Dakota was still in foster care, and Amanda was still unemployed, although she had obtained a divorce from Andrew. The court's order stated that Amanda had complied with some, but not all of the court's orders, and that she had been to some of her therapy sessions and had visited Dakota regularly. The court ordered Amanda to continue with individual therapy and to complete her anger management courses. The court declined to return Dakota to Amanda's custody, however, deferring that decision until the permanency planning hearing scheduled for March 19, 2002.

At the March 19, 2002, hearing, the court found that Amanda had been in her home with the utilities turned back on since the last hearing, but remained unemployed. Jaime Penn testified that she believed Amanda was not having contact with Andrew, and that Amanda was trying to comply with the case plan and court orders. Penn stated that her home visit showed Amanda's home to be appropriate, and that she saw no reason why Dakota could not start weekend visitations with Amanda. The court agreed that Dakota could have weekend visits with Amanda for four weeks, noting that "if everything goes well, Dakota may be returned to the mother."

However, at a May 15, 2002, hearing, Jaime Penn testified that ADHS had received complaints from Dakota's daycare that Dakota had returned to daycare wearing dirty clothes after his weekend visits with Amanda; Penn also said that Dakota was so dirty that the daycare had to give him a bath. Penn also noted that Dakota had scars on his knees and a cut on his ear; Penn related that Dakota had told her that Andrew pushed him down and pulled his ear. Penn further stated that she had conducted a home visit, and there was an odor in the house, trash in the kitchen, and a litter box in the living room. Penn also noted that there were still some of Andrew's clothes in the closet. However, Amanda denied that Andrew lived with her and claimed that she only saw him about

once a week. She further claimed that a male friend was living with her to help with some of her bills. After the ADHS home visit, Winter was placed into foster care on May 20, 2002.

On July 9, 2002, ADHS filed a petition for termination of parental rights with respect to Dakota, asserting that Amanda had continued to have frequent contact with Andrew. In addition, Amanda had continued to maintain contact with Andrew, and Andrew had physically abused Dakota on his visits to Amanda's home. An amended petition for termination alleged that Amanda was not willing or capable of protecting her children from Andrew. A termination hearing was held on August 27, 2002, at which time Sharon Dollarhide, who had Dakota in her daycare, testified that Dakota came back from a weekend visit in the same clothes he had on the Friday before; he also had a dirty diaper and dirt under his fingernails. Jaime Penn testified that, in June of 2002, Amanda had been in a car accident and had lost her unborn baby; Amanda was with Andrew at the time of the accident, and Andrew was driving. For her part, Amanda testified that she had bought a trailer with the settlement arising out of the accident, and that she had about $6,000 left over from the settlement money. She denied that Andrew had been in her home, and claimed she did not know where he lived.

In a September 23, 2002, order following the August hearing, the trial court continued its finding that Amanda was an unfit parent. In particular, the court pointed to evidence that, after weekend visits between Dakota and Amanda, Dakota was returned to his daycare "in an unacceptably filthy condition," crediting Dollarhide's testimony about how dirty Dakota was when he was returned to daycare. In addition, the court noted that the environmental conditions inside Amanda's home had deteriorated, and that, although Amanda was unemployed and had no electricity, she had nevertheless purchased dog food "with money that could be better used." The court specifically found Amanda's testimony to be lacking in credibility, stating that although the obituary for Amanda's baby listed Andrew as the father, Amanda claimed she had not been involved with Andrew. The court stated that her testimony was "incredulous at best, perjury at worst." The court's order then scheduled a permanency planning hearing for October 22, 2002, and a termination hearing for November 7, 2002.

The court heard testimony at the October hearing that Amanda was living in her new trailer in North Little Rock; Jaime Penn testified that it was one of the best homes that Amanda had

been in, and that it was neat and clean. Amanda testified that all of her bills were paid, that she owed nothing on the trailer, and had paid her rent six months in advance, but she could not find a job. She denied that Andrew had been to her house. At the conclusion of the hearing, the court opined that Amanda had not "achieved a sufficient period of stability at this point to warrant a return" of the children. The court also denied increased visitation due to the possibility that Amanda's parental rights would be terminated at the next hearing. The order entered after this hearing reflected that the court found that "no compelling reasons exist to continue the goal of reunification. The parents have not been making diligent efforts to comply [with] either the case plan or prior court orders, and continue to be unstable. Amanda Trout continues to be unemployed and has not participated in counseling arranged by the Department of Human Services."

At the November 7, 2002, hearing, ADHS supervisor Caroline Banks testified that she had overheard Amanda asking for a phone number so she could call and cancel her therapy appointment. Banks also testified that, on a home visit earlier in the year, Amanda's house was cold, filled with trash, and smelled like rotting food. Also at that hearing, Lily Owens, an adoption specialist for ADHS, testified that there were available families willing to adopt Dakota and Winter, and that the likelihood was very great that they would be adopted.

Amanda testified that she had started working at Waffle House the Sunday before the hearing, and had started a job-training program through Arkansas Rehabilitation Services that Monday. However, she said that the job and the training program interfered with each other, so she might have to quit the job-training program. She claimed that she had corrected the conditions that had caused her children to be taken away from her: she had divorced Andrew, moved into a nicer place, and started counseling and a job-placement program. She claimed that she would continue with her therapy, keep a job and a stable household, and would take parenting and stress-management classes if she could keep her children.

Nevertheless, the trial court found that Amanda had not had a sufficient period of stability to indicate that there was a reasonable likelihood that she would be able to get Dakota and Winter back in her home in the foreseeable future. The court noted that it did not have to "give a lot of weight to eleventh-hour improvements," and that those improvements should be considered "to

determine if they are good faith efforts or just an effort to try to keep the court from making a critical decision." Noting that it had to consider things from the child's perspective, the court found that it was contrary to Dakota's best interests to return him to Amanda's custody. In addition, the court found that Amanda did not have a sufficient track record to prove that she was making a turn for the better, and the court stated its belief that she was still an unfit mother. Given the limited likelihood of reunification with Amanda, the court terminated her parental rights with respect to Dakota. In addition, the court determined that there was little likelihood that continued services to the family would result in a successful reunification of Winter and Amanda.

In its order terminating Amanda's parental rights, the court stated that, despite the numerous opportunities and various forms of assistance and therapy Amanda had been offered, "she continues to be unfit to be a parent to Dakota and Winter. Despite years of counseling, and other services provided by ADHS, there is a little likelihood that Amanda Trout will ever be ready to be reunited with her children, and provide the home life and parenting they need." The court therefore ordered that Amanda's parental rights be terminated.

On appeal, Amanda raises two points: 1) the trial court's decision to terminate her parental rights was not supported by the evidence; and 2) the court erred in terminating her rights as to Winter because the child had not been out of her home for a period of one year as provided in Ark. Code Ann. § 9-27-341. The question this court must answer is whether the trial court clearly erred in finding that there was clear and convincing evidence of facts warranting termination of parental rights. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). In resolving this question, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* Here, the trial court terminated Amanda's parental rights pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) and (ix)(*a*)(*3*)-(*4*) (Repl. 2002). The relevant subsections of the statute provide as follows:

> (3) An order forever terminating parental rights shall be based upon a finding by clear and convincing evidence:

> (A) That it is in the best interest of the juvenile, including consideration of the following factors:

(i) The likelihood that the juvenile will be adopted if the termination petition is granted; and

(ii) The potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent, parents, or putative parent or parents;

(B) Of one (1) or more of the following grounds:

(i)(*a*) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the [D]epartment [of Human Services] to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent.

\* \* \* \*

(ix)(*a*) The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to:

(*3*) Have subjected the child to aggravated circumstances; [or]

(*4*) Have had his [or her] parental rights involuntarily terminated as to a sibling of the child[.]

Ark. Code Ann. § 9-27-303(6) (Repl. 2002) provides, in turn, that the phrase "[a]ggravated circumstances" means that "a child has been abandoned, chronically abused, subjected to extreme or repeated cruelty, or sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification[.]"

Amanda concedes that this court must give great deference to the trial court, but claims that the court here was biased against her from the first hearing because it could not separate the cases involving her stepchild, Jonathyn, from the cases involving her biological children.[3] She argues that the problems with her old

---

[3] To the extent that Amanda argues that the trial court was biased against her, there is no indication in the record that she ever made such an argument to the trial court or asked the trial court to recuse. In the absence of such efforts, this court will not consider the argument on appeal. *See Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 47 S.W.3d 866 (2001).

housing and her former husband were resolved by the time of the final hearings, and she contends it was wrong of the court to disregard the progress she had made. Finally, she asserts that the court should have given her a few more months in order to have an opportunity to comply with all the orders. She urges that there would have been no danger to the children because they were in foster care at the time.

■ However, to agree with Amanda's claims that the court should have given her more time to comply with its orders would be to ignore the fact that she had consistently failed to comply with the court's orders over the course of nearly two years. Throughout the course of this case, Amanda maintained contact with Andrew, who, from all the evidence, was clearly abusive and violent. She failed to find employment until the week of the November hearing, nearly two years after her case had come to the court's attention. She persistently failed to complete court-ordered courses of counseling and therapy. The fact that she had purchased a trailer and had paid the rent on the lot for six months was indeed a positive development, but she stated that she had paid for these things with money from the car-wreck settlement, and did not indicate where or whether she would be able to find money after those funds ran out. In sum, the trial court was justified in concluding that there was little likelihood that she would ever be ready to be reunited with her children.

■ In considering this case, we must note the purpose of the termination-of-parental-rights statutes: Ark. Code Ann. § 9-27-341(a)(3) (Repl. 2002) provides as follows:

> The intent of this section is to provide permanency in a juvenile's life in all instances where the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective.

In *Dinkins v. Arkansas Department of Human Services, supra,* this court noted that, where the mother had been receiving services for two years and had still not managed to consistently comply with her case plan, the termination of parental rights was appropriate to effectuate the intent of the statute. *Dinkins,* 344 Ark. at 214-15. There, this court gave due deference to the trial court, which had "heard and observed [the] witnesses first-hand." *Id.* at 215.

Similarly, in *Jefferson v. Arkansas Department of Human Services*, 356 Ark. 647, 158 S.W.3d 129 (2004), this court upheld the trial court's termination of parental rights where the mother had been evicted from her home, was frequently unemployed, was forced to rely on relatives for assistance, was inconsistent in attending therapy sessions, and failed to follow the court's orders. Given these facts, this court held that the mother "manifested an incapacity or indifference to correct the conditions that led to [the child's] removal from her home." *Jefferson*, 356 Ark. at 664.

In the present case, as in *Dinkins*, the trial court had been in a position to observe Amanda since 2000. During that time, Amanda repeatedly failed to comply with the court's orders, including orders that she get counseling and protect the children from Andrew. The court consistently expressed difficulty with believing Amanda's testimony, and it was appropriate for the judge to consider the history of Amanda's appearances before him in determining whether she could be trusted to continue making positive steps. Given the court's experience with Amanda and her case, the court concluded that it was unlikely that she would do so. Further, as in *Jefferson*, Amanda's persistent failure to comply with the court's orders demonstrated that she was either incapable of correcting the problems or indifferent to the need to do so.

Our court of appeals has held that there are "no case[s] in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as when the interests of minor children are involved." *See Arkansas Dep't of Human Servs. v. Couch*, 38 Ark. App. 165, 832 S.W.2d 265 (1992); *In Re Adoption of Milam*, 27 Ark. App. 100, 766 S.W.2d 944 (1989). We therefore affirm the trial court's decision to terminate Amanda's parental rights with respect to Dakota.

In her second point on appeal, Amanda argues that it was inappropriate for the trial court to terminate her rights as to Winter, as the younger child had only been out of her custody for five months. She further argues that the evidence was insufficient to remove Winter, and that there would have been no danger to Winter if the child had been left in Amanda's care. Amanda claims that her children were removed "because of a couple of complaints that the children were dirty and the Department['s suspicion] that Winter's father was still in the picture."

Amanda's assertion here amounts to a gross oversimplification of the facts of this case. The trial court had before it a

record spanning nearly two years in which Amanda did little to disassociate herself from a violent, abusive man until the very end, when it became apparent that her rights might be terminated. In addition, the case began with allegations of serious abuse, when Andrew struck Jonathyn across the face hard enough to leave marks; although Amanda herself was not accused of abusing her children, there was proof that she failed to prevent Andrew from abusing them. Her failure to protect her children from Andrew, coupled with her persistent failure to discontinue seeing Andrew, was part of the trial court's reasoning for terminating her parental rights.

This brings us to the heart of Amanda's argument in her second point on appeal, wherein she claims it was error to terminate her rights as to Winter. Although it is true that Winter had only been out of Amanda's home for five months, § 9-27-341 provides that an order terminating parental rights must be based upon one of several grounds, one of which is the twelve-month continuation of the child out of the home. *See* § 9-27-341(a)(3)(B)(i)(*a*). However, termination is also appropriate when the trial court finds that the parent has subjected the child to aggravated circumstances, *see* § 9-27-341(a)(3)(B)(ix)(*a*)(*3*), or when the parent has had his or her parental rights involuntarily terminated as to a sibling of the child. *See* § 9-27-341(a)(3)(B)(ix)(*a*)(*4*). As noted above, aggravated circumstances exist when, among other things, a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification.

Either or both of these provisions apply to the instant case. Amanda's parental rights were terminated with respect to Dakota, Winter's sibling, and, as discussed above, the trial court properly determined that there was little likelihood that continued services would result in reunification. As we did in *Dinkins*, we must point out that this case has gone on for more than two years. The emergency clause preceding the 1997 amendments to the Juvenile Code stated one of the purposes of our statutes is to "insure the best interests of Arkansas' children in achieving a safe and permanent home." The court's review and conclusion of this case is long overdue, especially in light of the convincing evidence that Amanda failed to remedy the serious problems that caused her children to be removed from her custody and placed with ADHS years ago. Thus, because the trial court's order terminating Aman-

da's parental rights is not clearly erroneous, we affirm. The court of appeals' decision is reversed on petition for review.