Leona MERIWEATHER *v.* ARKANSAS DEPARTMENT of HEALTH & HUMAN SERVICES

CA 06-955                                            255 S.W.3d 505

Court of Appeals of Arkansas
Opinion delivered April 11, 2007

*Killough Law Firm*, by: *Larry Killough, Jr.*, for appellant.

*Gray Allen Turner*, Office of Chief Counsel, for appellee.

*Sharon Bray Taylor*, Attorney ad Litem.

JOHN B. ROBBINS, Judge. Appellant Leona Meriweather appeals the termination of her parental rights to her daughter SM, as found by the White County Circuit Court. SM was born in March 2005, and she was removed from appellant's custody in April 2005. The order terminating parental rights was entered on July 26, 2006, from which she filed a timely notice of appeal.[1]

Appellant argues that the trial court clearly erred in terminating her parental rights because she undisputedly completed the requirements of her case plan, and because her low intellectual functioning was not a sufficient basis upon which to terminate her parental rights. The Department of Health and Human Services (DHHS) and the child's attorney ad litem have filed a combined brief in opposition to appellant's arguments on appeal, asserting that there is no reversible error. We affirm.

The history of this case is as follows. SM came into custody as a one-month-old when she was treated at a hospital for a spiral fracture to her left humerus and there was an adult-sized-hand-shaped bruise on her right thigh. Appellant was the child's sole care giver and offered no explanation for the injuries. After being removed from her mother's care, SM thrived in foster care. She was developing appropriately for a child just over one year old, and the DHHS case worker testified that it was highly likely she would be adopted if cleared for such a plan. SM had no special needs.

---

[1] This appeal is governed by the new rules promulgated by our supreme court in a per curiam opinion handed down on May 18, 2006. The rules, effective July 1, 2006, provide for an expedited process within which appeals from dependency-neglect cases are heard.

The concern was that appellant needed intensive and constant supervision and instruction in how to parent SM at each stage of development. Appellant was admittedly of low intellectual function, with an I.Q. of sixty-nine, bordering on mild mental retardation. Appellant also had physical disabilities, suffering from severe asthma and rheumatoid arthritis. Appellant had been offered parenting classes, counseling referrals, nutritional instruction, housing assistance, home visits, transportation, visitation with her child, and daily routine and hygiene training. Appellant had been cooperative and completed the lion's share of the case plan. However, DHHS personnel had observed that in appellant's two-hour visits with her daughter, appellant would sometimes handle the child too roughly, and she would often fall asleep for the second hour of the visit. Due to the arthritis, appellant had difficulty in physically handling SM. Due to her intellectual functioning, appellant required a lot of assistance and cheerleading from DHHS staff. For the last month of the case plan, appellant was permitted semi-supervised two-hour visits in her home with her daughter, but DHHS was concerned that these two-hour increments were the outer limit of appellant's capacity to care for the child. In short, while it was clear that appellant was receptive to services, and she tried to gain what was being offered to the best of her ability, she would need assistance indefinitely. The caseworker summed up the situation by saying that appellant was willing, but incapable, of independently caring for her daughter.

Appellant testified that she lived in Searcy, Arkansas, with her diabetic mother in a three-bedroom trailer. Appellant did not work and instead drew disability benefits, which met her monthly expenses. Appellant said she took pain medication for her arthritis and used an inhaler for her asthma. She said she assisted in her mother's care. Appellant agreed that she needed the help of DHHS in the beginning, but she appreciated the assistance, she had learned, and she loved her daughter and wanted her to come home. Appellant testified that she thought SM's arm had been broken due to either placing SM in or removing SM from the car seat. Appellant admittedly did not have custody of an older daughter either, but she enjoyed visitation with her.

The trial court rendered findings at the end of the hearing, terminating appellant's parental rights. The judge found that after the original filing of the petition for dependency-neglect, other factors had arisen demonstrating that return of the child to her mother would be contrary to the child's health, safety, and welfare.

Specifically, the trial court found that appellant was incapable of remedying the conditions, and further, she had subjected the child to aggravated circumstances. The judge remarked:

> We've got a 15 month old child that despite the intensive efforts of the Department of Human Services to provide assistance, we've only gotten to the point where we can have 2 or 3 hour unsupervised visits in the home with her mother. Raising a child is much more, as we all know, than 2 or 3 hours worth of effort. It is a day in and day out concentrated effort that requires ability to reason, ability to concentrate, formulate, problem solving methods, respond to emergency situation; just to keep the safety of the child in place, not to mention all of the other things that go with parenting. . . . It may very well be that if we maintained a fourteen and a half year more intensive foster care case, that we would reach this juvenile's 18th birthday without her having been severely harmed physically. I doubt seriously that we could reach her 18th birthday without her being severely harmed emotionally and psychologically.

The order recited that due to the mother's low intellectual level and limited mental capacity, SM could not be returned home in a reasonable period of time. The order noted that the child was likely to be adopted and that it was in her best interest that termination of parental rights be ordered. This appeal followed.

We review termination of parental rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Grounds for termination of parental rights must be proven by clear and convincing evidence. *M.T. v. Ark. Dep't of Human Servs.*, 58 Ark. App. 302, 952 S.W.2d 177 (1997). Clear and convincing evidence is that degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). When the burden of proving a disputed fact is by clear and convincing evidence, the appellate inquiry is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous. *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). We give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* Where there are inconsistencies in

the testimony presented at a termination hearing, the resolution of those inconsistencies is best left to the trial judge, who heard and observed these witnesses first-hand. *Dinkins v. Arkansas Dep't of Human Servs.*, *supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

The goal of Arkansas Code Annotated section 9-27-341 (Supp. 2003) is to provide permanency in a minor child's life in circumstances in which returning the child to the family home is contrary to the minor's health, safety, or welfare and the evidence demonstrates that a return to the home cannot be accomplished in a reasonable period of time as viewed from the minor child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Parental rights may be terminated if clear and convincing evidence shows that it is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3). Additionally, one or more statutory grounds must be shown by clear and convincing evidence.

Appellant does not dispute that SM was out of the home for at least a year, nor does she dispute that she needed assistance to learn how to effectively behave as a parent to her infant. She does not dispute that SM's arm was broken within a month of her birth, while appellant was the care giver. Her contention is that the trial judge clearly erred in terminating her parental rights where she had completed the case plan requirements set forth by DHHS. Appellant argues that she had learned through training how to care for her daughter. Appellant asserts that DHHS "chose the easy way out" and sought termination on the basis of appellant's mental deficiencies rather than continue to provide training and assistance in the long term to keep the familial ties. Appellant, however, acknowledges the existence of statutory grounds for termination, that being parental inability or incapacity flowing from mental deficiency. Ark. Code Ann. § 9-27-341(b)(3)(vii)(c).

DHHS and the attorney ad litem assert that appellant never fully accepted responsibility for SM getting hurt in her care, and further that appellant was physically and mentally incapable of caring for her daughter without intensive and constant assistance. They assert that SM needed permanency, and termination of parental rights was the only means by which to achieve that goal.

We are duty-bound to support the trial court's action that gives effect to the legislature's overriding intent, which is to protect the best interest of our state's children in achieving a safe

and permanent home. Ark. Code Ann. § 9-27-341(a)(3). While appellant attempted to be the parent that her child needed, she was not able to be that parent, at least not without a steady support system provided by DHHS. *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). Improvement and compliance toward the end of a case plan will not necessarily bar termination of parental rights. *See Camarillo-Cox v. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *Trout v. Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d 486 (2004); *Dinkins v. Arkansas Dep't of Human Servs., supra.* Appellant cites to our court's resolution of the *Camarillo-Cox* and *Trout* cases on appeal, as examples of reversible termination orders. However, the Arkansas Supreme Court took those appeals on review and reversed our decisions, ultimately affirming the trial court decisions in those cases. Therefore, appellant's citation to the earlier opinions as persuasive authority is to no avail.

After a thorough review, we are not left with a definite and firm conviction that a mistake has been made. We are convinced that appellant was willing to try to be the parent SM needed, but she was unable to be that parent on her own.[2] Appellant's parental rights simply had to yield to the best interest of SM. On the evidence before us, we cannot say that the trial court's findings are clearly erroneous.

Affirmed.

PITTMAN, C.J., GLADWIN and BIRD, JJ., agree.

HART and GRIFFEN, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting.

*It is a capital mistake to theorise before one has data. Insensibly one begins to twist facts to suit theories, instead of theories to suit facts.*
— Sherlock Holmes speaking to Dr. Watson in *A Scandal in Bohemia* by Arthur Conan Doyle

I respectfully dissent from today's decision to affirm the order terminating the rights of a loving, sincere, and dedicated mother regarding her two-year old daughter arising from un-

---

[2] Appellant does not assert that DHHS discriminated against her or failed to provide any services to her or make reasonable accommodations for her pursuant to the Americans with Disabilities Act.

founded prejudice toward the mother's future parenting capacity because she is mildly retarded. Today's decision is unjust for at least three reasons: (a) there is no evidence showing that Meriweather is unable or unwilling to provide adequate care for her daughter; (b) the Department of Health and Human Services failed to prove that Meriweather cannot or will not cooperate with or seek assistance in caring for her daughter; and (c) the circuit court's decision to terminate parental rights — and the Department's recommendation that parental rights be terminated — appears to be based on prejudice toward persons of below average intelligence that violates our cherished value of equal protection under the law.

Admittedly, appellate review is deferential to the circuit court. *See Benedict v. Ark. Dep't of Human Servs.*, 96 Ark. App. 395, 242 S.W.3d 305 (2006) (stating that the appellate court does not reverse a termination order unless it is clearly erroneous and that the appellate court does not substitute its own credibility determinations for that of the circuit court). Because this case is one where the Department and the circuit court simply assumed that Leona Meriweather would be unable to care for her child, I am left with "a definite and firm conviction that a mistake has been made."

S.M. was brought into the Department's care after Meriweather presented S.M. to the White County Medical Center with what was discovered to be a broken arm. The child was later transported to Arkansas Children's Hospital in Little Rock, where doctors were concerned about her safety. While the Department would have this court find — despite the fact that appellate courts generally do not make findings of fact — that Meriweather intentionally inflicted the injury that caused S.M.'s broken arm, there is no such evidence.

As the case progressed, S.M.'s arm healed and she is now a healthy child with no special needs. Meanwhile, Meriweather cooperated with efforts to improve herself and make her home appropriate for a young child. Throughout the case, Meriweather has complied with the case plan and court orders. Meriweather has maintained an acceptable home while taking care of her diabetic mother, has no moral issues, and lives within her meager means. In short, she has done what society expects every good parent to do. For her efforts, the Department proceeded with termination proceedings and ultimately succeeded in having Meriweather's parental rights terminated.

Therefore, before this court is a healthy child with a mother whose only limitation is that she is mildly retarded. Absent the

child's broken arm, which has now healed, there is no reason to believe that the Department would have become involved with this family. Certainly, the fact that the child suffered a broken arm affords no basis for terminating appellant's parental rights where the record does not show that a parent injured the child. It is the fact that Meriweather is a mildly retarded parent that produced the termination recommendation by the Department and decision by the circuit court. The Department rushed the case to a termination proceeding, despite no evidence on how S.M. suffered the broken arm and even though children raised by the most intelligent parents still suffer unfortunate accidents.

The majority opinion concedes that Meriweather has "been cooperative and completed the lion's share" of a case plan that involved parenting classes, counseling referrals, nutritional instruction, housing assistance, home visits, transportation, visitation with her daughter, and daily routine and hygiene training. The majority acknowledges that Meriweather was permitted what it termed "semi-supervised" two-hour visits with her daughter in her home. That acknowledgment is only partially accurate. Elizabeth Light, a family service worker for the Department of Health and Human Services, testified that Meriweather had progressed to unsupervised visits with her daughter in her home:

> She has made her visitations. In the last month her visitation has changed. Before it changed it was a 2 hour long session a week at the Department. In the last month we have moved the visits into her home. A few of them have been unsupervised. They were unsupervised to observe and to determine if she might be able to care for [S.M.] in her home. The visits to this point have been okay.

> . . . .

> She has gone from supervised visits at the Department to unsupervised visits now, but only for short periods of time. I would not ever leave a child in someone's care that I thought they were in immediate danger. The child is now about 15 months. An infant can not protect itself. She is becoming a toddler if you consider a 15 month old no longer a baby. She has been able to take care of the child at the most vulnerable time in its life but that vulnerable time is over. She has been seeing the child unsupervised in her home for short periods of time. We do not know what would happen if it was expanded.

Johnna Collins, a social service aide for the Department, was the assigned staff member who worked with Meriweather on parenting education. Despite admitting that "parenting education is difficult," that Meriweather attended and worked hard in the classes, and that Meriweather "requires a little bit lengthier time to train . . . due to the fact that she's a little bit slower functioning," Collins testified that Meriweather completed twelve of the parenting classes "and she actively participates." Regarding the decision to permit unsupervised visitation, Collins's testimony was most revealing:

> It was a collective decision to let the visits go unsupervised at her home. We case conferenced this case probably more than any other case that I have ever worked on. Trying to determine the right services to put in place and these visitations, to say they have been supervised the whole time would be untruth. They have been at the Department the whole time, but for the most part, unsupervised probably the last 4 months at the Department. We give her a location, we get her set up. She and I talk about anything that is going on with the baby and then I leave her alone so that she gets some bonding time. Up until a month ago that was all at the Department. Her home was appropriate and an important step for myself and the worker is to see what interaction was going to take place in the home and it also kind of alleviated any doubt. I said from the beginning, some of the concerns I have are she is so nervous with DHS looking at her. Which is understandable to some extent. So it was an idea that we had to see, when big brother is not watching every second, to give her a more natural parenting environment, to see how that was going to work. There were a lot of people in on the decision at the Department to extend the unsupervised visits at her home.
>
> With the visitation at her home they were 2 to 3 hours. The first two I went and stayed. I went in and established a routine, what would take place during that time frame. What could happen and what the routine needed to be. The third and fourth visitation, we would just drop the baby off and come back and just kind of see how things were going. Then the last, we just dropped the baby off. She carries the baby out of the car seat and then when the visitation is over we go back and pick the baby up.
>
> As far as I know the visitations went well. I did not see any evidence or any subtleties about the situation to cause me concern

during those visits. I did feel like the baby was safe during those visits. We would not have left her if we did not feel that way. . . .

Leona did react to her training well with [S.M.]. She has not shown any indifference to this whole process. She has been very active and very concerned. I do not think there is any incapacity from these things. I just think that it requires special training.

It is preposterous to think that Meriweather would have even been allowed unsupervised visits at the Department if the Department was truly concerned about her ability to care for her daughter. The fact that the Department allowed her to exercise unsupervised visits at her home flies in the face of a finding that Meriweather poses a present or future threat to the health and safety of her child.

Because Meriweather is mildly retarded, she is slow to learn new skills. However, there is no proof that she cannot learn. The record is exactly to the contrary. Elizabeth Light testified that Meriweather took the parenting class twelve times in order to satisfy its requirements. The fact that she eventually completed the course is important. It is equally important that Meriweather persisted because that demonstrates that she wanted to learn how to care for her daughter. The kind of commitment that Meriweather has demonstrated to becoming an effective parent is commendable, not a reason for terminating her parental rights.

The circuit court appears to have based its decision on the Department's belief that Meriweather would continue to need support and training as her daughter grows and matures. Based on that belief, the circuit court concluded, "Due to the mother's low intellectual level and limited mental capacity, the mother will probably never be able to have the child back in her home in a reasonable amount of time considering the age of the child. Despite the offer of services to the mother she is unable to have the child returned to her home. It is highly likely the child will be adopted." The circuit court's conclusion is inconsistent with the uncontroverted proof that Meriweather demonstrated the ability to care for her daughter during unsupervised visitation in her home.

Sadly, the circuit court's conclusion shows that Meriweather's parental rights were terminated due to what amounts, at best, to rank speculation and, at worse, to prejudice concerning her future parenting capacity. The Department's witnesses testified

that Meriweather's mild retardation does not prevent her from learning parenting skills, retaining what she learns, or applying what she has learned in an unsupervised parenting context. Every witness from the Department testified that Meriweather demonstrated the capacity to properly care for her daughter during the most vulnerable period of a child's life. None of the Department witnesses expressed the slightest reservation about Meriweather's commitment to acquire new skills as her daughter develops, and they agreed that all parents grow as their children develop.

Yet, the Department recommended and the trial court found that Meriweather's parental rights be terminated because the Department believes that Meriweather will require continued training in parenting as her daughter matures. Johnna Collins testified on cross-examination by counsel for Meriweather about being concerned how Meriweather would fare as her daughter passed through the teenage years. No proof was presented to show how anyone could know whether even a parent of normal intelligence would function as a parent a decade into the future. However, this was the speculation upon which the circuit court's termination decision was made, and that speculation is now being affirmed by the majority. Judging from today's decision, the fact that Meriweather satisfied the Department that she could manage her household finances within the limited means of her Social Security benefits, attend to her infirm mother, and also persist in completing parenting classes, is inconsequential.

The decision today and the result that it affirms bear out the truth that Sherlock Holmes asserted to Dr. Watson about the error of theorizing without facts. The circuit judge had no facts showing how any person will parent years into the future. The Department presented no such evidence. The record contains no evidentiary basis for deciding that Meriweather will not be a caring, committed, and attentive parent as her daughter matures. There is no factual basis for concluding that Meriweather is unqualified on account of her retardation from requesting any parenting assistance that she might need. There are no facts showing that the child will present extraordinary challenges. As Holmes told Watson, it is a "capital error" to jump to formulate theories without facts. It is a colossal error to jump to conclusions without facts. Doing so can hardly be termed "fact-finding."

Instead, the judgments reached by the Department of Health and Human Services, the circuit court, and now the majority amount to sheer prejudice. Regardless of the good intentions of

everyone concerned for Meriweather's child, no factual basis exists for believing that Meriweather cannot parent her daughter effectively at this time, or that she will not be able to effectively parent her daughter in the future. The only plausible explanation for the decision reached in her case, unfortunately, is the real yet impermissible factor of prejudice toward Meriweather because she is mildly retarded. The fact that prejudice is an unpleasant observation to make does not make it any less obvious in this instance.

This case also exposes a fundamental disregard for the Department's statutory responsibility to assist in preserving the family unit and upholding the natural right to be a parent. In *Benedict, supra,* this court cited several United States Supreme Court cases stating that "a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment." 96 Ark. App. at 397, 242 S.W.3d at 308 (citing *Troxel v. Granville,* 530 U.S. 57, 77 (2000) (Souter, J., concurring)); *see also Washington v. Glucksberg,* 521 U.S. 702 (1997); *Santosky v. Kramer,* 455 U.S. 745 (1982); *Parham v. J.R.,* 442 U.S. 584 (1979); *Quilloin v. Walcott,* 434 U.S. 246 (1978); *Wisconsin v. Yoder,* 406 U.S. 205 (1972); *Stanley v. Illinois,* 405 U.S. 645 (1972); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925); *Meyer v. Nebraska,* 262 U.S. 390 (1923). The court also noted that the clear-and-convincing standard of proof required in termination cases and cited from the Supreme Court again, stating that the higher burden of proof "impresses the fact-finder with the importance of the decision and thereby perhaps to reduce the changes that inappropriate terminations will be ordered." *Id.* at 397, 242 S.W.3d at 308 (citing *Santosky,* 455 U.S. at 764-65). We cited those decisions to impress upon the Department and Arkansas courts that termination proceedings are not meant to be taken lightly. Before the State permanently severs the parent-child relationship, it must overcome a fair yet necessary presumption that parents ordinarily are the best persons to care for their children. That presumption does not turn on the intelligence level of the parent.

These standards were ignored in this case. The Department filed for emergency custody of S.M. on April 12, 2005. A year — literally to the day — later, the Department filed the petition to terminate Meriweather's parental rights. Despite the fact that Meriweather made undisputed progress in her parenting abilities, the Department preferred to end its statutory duty to reunify this family. *See* Ark. Code Ann. § 9-27-302(2) (Repl. 2002). If there

continues to be hope in reunifying a parent and child, the State has a moral and legal obligation to continue providing reunification services. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Benedict*, 96 Ark. App. at 398, 242 S.W.3d at 309 (quoting *Santosky*, 455 U.S. at 753).

While the evidence here shows that Meriweather will require assistance in caring for her daughter, there is no proof that the Department lacks services to provide to Meriweather or that Meriweather is unwilling or unable to seek and benefit from those services. The Department exists, at least in part, to provide those services. However, "we do not interpret our statutes to mandate termination of parental rights as soon as the children have been out of their parent's custody for over twelve months." *Id.* at 412, 242 S.W.3d at 318-19. When there is still reason to believe there can be a positive, nurturing parent child relationship, the law favors preservation, not severance, of natural familial bonds. *Id.* (citing *Santosky, supra*).

Nor should the State be willing to strip a parent of her natural right to be a parent simply because another parent may be better equipped to take care of the child. We presume that a fit parent acts in the best interests of his or her children. *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). "Courts are very reluctant to take from the natural parents the custody of their child, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life." *Holmes v. Coleman*, 195 Ark. 196, 198-99, 111 S.W.2d 474, 476 (1937). The State has millions of dollars worth of resources at its disposal. Meriweather is a parent who is willing, and has always been willing, to take advantage of those resources to better herself for the sake of her child. It is a sad state of affairs when the Department is unwilling to provide the services a mildly retarded parent needs in order to help preserve the parent-child relationship.

Prejudice against persons of reduced mental capacity does not excuse taking their children from them. Before this decision, one might have reckoned that the courts of this state would not countenance such prejudice as a reason to terminate parental rights. Because I believe that the decision in this case represents

what Holmes called "a capital mistake to theorise absent data," I am forced to dissent from the decision announced by the majority.

I am authorized to state that Judge HART joins in this opinion.