2010 Ark. App. 379

**Natasha BLAKES, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES; J.B., minor child, Appellees.**

No. CA 09–858.

Court of Appeals of Arkansas.

May 5, 2010.

Suzanne Ritter Lumpkin, Little Rock, AR, for appellant.

ROBERT J. GLADWIN, Judge.

On April 30, 2009, the Crittenden County Circuit Court terminated appellant Natasha Blakes's parental rights to J.B., who was born April 7, 2006, when she was fifteen and in the custody of the Division of Youth Services (DYS) for delinquent activity. Appellant's attorney filed a motion to withdraw pursuant to *Linker–Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), asserting that there are no issues of arguable merit to support the appeal. In accordance with Rule 6–9(i)(1) of the Arkansas Rules of the Supreme Court and Court of Appeals (2009), counsel's motion is accompanied by an abstract, addendum, and brief listing adverse rulings made at the termination hearing and explaining why there is no meritorious ground for reversal, including a discussion of the sufficiency of the evidence to support the termination order. The clerk of this court sent a copy of counsel's motion and brief to appellant, informing her that she had the right to file pro se points for reversal. *See* Ark. Sup.Ct. R. 6–9(i)(3). Appellant did not file any pro se points for reversal.

Appellant's counsel initially failed to brief two adverse rulings, and on February 3, 2010, we sent the case back for rebriefing. *See Blakes v. ADHS*, 2010 Ark. App. 108, 2010 WL 374408. Because appellant has complied with the requirements established by the Arkansas Supreme Court for no-merit termination cases, and because we agree that the appeal is wholly without merit, we affirm the termination order and grant appellant's counsel's motion to withdraw.

This case originated when J.B. was placed into DHS custody on April 9, 2006, while appellant was incarcerated, and DHS filed a dependancy-neglect petition on April 12, 2006. The circuit court entered an order for emergency custody of J.B. that day. The court entered an order of probable cause on April 17, 2006. It held an adjudication hearing on May 22, 2006, when appellant was still incarcerated. The court approved DHS's case plan and stated that the goal would be reunification. The court directed appellant to complete parenting classes; to submit to random drug screens; to cooperate with the department; and to obey the court's orders. Appellant was released from DYS in May 2006 and was placed in a foster home with J.B. The court held a review hearing on June 20, 2006. The court ordered appellant not to leave her foster home with J.B. and imposed the same requirements on appellant as previously ordered.

After less than a month with J.B., appellant took him from the home without permission; left him with someone; and then called her caseworker to report him as having been kidnapped. DHS located the baby and placed him and appellant in separate foster homes. The court held a review hearing on August 29, 2006, continued the goal of reunification, and ordered appellant to attend school daily with no unexcused absences and to follow the rules in her foster home. The court held another review hearing on October 16, 2006, with a continued goal of reunification. At the review hearing held on December 12, 2006, the court entered an order directing that J.B. be placed in foster care separate from appellant. The court approved the visitation plan created for appellant and directed her to complete parenting classes and to obey the orders of the court. The goal remained reunification.

The court held a permanency-planning hearing on June 19, 2007. In the resulting order, the court continued the goal of reunification "only because the parent has been complying with the established case plan and orders of the court and has made significant measurable progress. . . ." The court noted that reunification was expected to occur by September 2007. Appellant was ordered to comply with the orders of the court and the terms of the case plan; complete parenting classes; cooperate with DHS and all service providers; follow the rules in her foster home; become stable in her foster-care placement so that her infant might be placed with her; and attend school daily with no unexcused absences.

The court held a review hearing on September 18, 2007, and continued the goal of reunification. The court continued supervised visitation, directed appellant to maintain school attendance, and ordered weekly home monitoring. The next review hearing was held on March 13, 2008. Although the court continued the primary goal of reunification, it added a concurrent goal of termination. In the order, the court noted that appellant had again been committed to DYS on March 10, 2008. It ordered her to obey the rules of DYS and to avail herself of services, such as anger management, while there. The court held an additional permanency-planning hearing on May 8, 2008, at which time DHS was deemed to have made reasonable efforts. After the hearing, the court changed the goal to termination.

Appellant turned eighteen in August 2008. When she left foster care, she moved into her aunt's home in West Memphis. In the November 2008 court report, DHS noted that appellant and J.B. had not been placed together since June 2006, because appellant had left him with an inappropriate babysitter and had informed the department that someone had taken her baby. The report added that (1) appellant had been unwilling or unable to control her anger, in spite of having been provided with multiple placements, counseling, several placements in acute care for behavioral problems, and medication; (2) DHS's attempts to effect visitation between appellant and J.B. had been hampered by appellant's verbal and physical aggression at each foster-care placement; (3) appellant had been unable to maintain foster placements or to control her behavior, and that, at the July 22, 2008 staffing, she cursed at the workers and stormed out of the room; (4) appellant remained unemployed and was financially, physically, mentally, and emotionally incapable of raising her child.

DHS filed a petition to terminate appellant's parental rights on October 7, 2008. It alleged that the child had been adjudicated to be dependant-neglected and had continued out of appellant's custody for twelve months and, despite a meaningful

effort by the department to rehabilitate appellant and correct the conditions that caused removal, those conditions had not been remedied. Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*) (Repl.2009). DHS also listed another ground, that other factors or issues had arisen subsequent to the filing of the original petition for dependancy-neglect that demonstrated that the return of the juvenile to the custody of appellant was contrary to his health, safety, or welfare, and that, despite the offer of appropriate family services, appellant had manifested the incapacity or indifference to remedy the subsequent issues or factors. Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(*a*) (Repl.2009).

The termination hearing was held on November 25, 2008, and appellant attended with her attorney. The case worker, Doreen Brown, testified that after appellant was released from DYS in May 2006, she and J.B. were placed together in a foster home in Cross County, from which they were sent to another foster home in Earle, in Crittenden County. She said that appellant and J.B. were together for less than a month; while there, appellant called her and stated that she had taken J.B. from the home and that someone, she did not know or care who it was, had taken J.B. Ms. Brown could not obtain any more information from appellant, so she and the county supervisor left immediately for Earle; before they arrived, another worker contacted her to say that she had the baby, whom appellant had left with the Mucherson family in Earle. She emphasized that appellant did not have authority to leave J.B. with anyone else. At that point, she said, appellant and J.B. were placed in separate foster homes to ensure the child's safety and well-being. Ms. Brown testified that appellant did not maintain the new foster-home placement; overall, appellant had over twenty placements in Crittenden, Mississippi, and Pulaski Counties, because of her behavior problems, and did not cooperate with DHS, follow the foster-home rules, or attend school daily without unexcused absences. Ms. Brown said that appellant assaulted a staff member at one of her placements (at Dana House in Stuttgart, where she stabbed a worker in the hand with a pencil); in Mississippi County, appellant took a knife to school, which resulted in her being suspended for one year. In an independent living program at The Centers for Youth and Families, she said, appellant disrupted her placement, and DHS moved her to Cross County; within a week, DHS moved appellant again. Ms. Brown said that the foster parent had requested immediate removal, and the police had become involved when appellant was verbally aggressive to the foster parent.

Ms. Brown testified about her extensive efforts to avoid termination of appellant's parental rights, and said that, throughout this proceeding, appellant received counseling. Ms. Brown said that, in November 2007, DHS placed appellant in Pinnacle Pointe (an acute-care facility) after she called Ms. Brown and made terroristic threats toward DHS workers; in fact, appellant was placed at Pinnacle Pointe five times because of aggressive behavior. She said that appellant was placed in Bridgeway in December 2007 after becoming violent again at the center, stating, "She cussed them out. She threatened them. She told them that she was—if they didn't moved [sic] out of her way, whoever her target person was, when the actual person that end up getting hurt, it was someone that was in the middle ended up getting injured by Natasha." Ms. Brown said that criminal charges were brought as a result, and appellant went back to DYS in February 2008; she was released in July 2008.

Ms. Brown indicated that appellant was currently living with her relatives and two siblings in a home lacking room for J.B.; was unemployed; had no income; and had not finished her GED, although she was working on it at the local community college. She stated that appellant had not learned how to control her anger and that she was a danger to J.B.; she did not know of any services to offer appellant that would lead to J.B.'s being safely returned to her care. Ms. Brown said that it was in J.B.'s best interest that appellant's parental rights be terminated; that his foster mother, Gina Norman, wanted to adopt him, and had completed all of the steps necessary for that to happen; and that J.B. had no special health needs. She acknowledged that appellant had improved, but did not think that her improvement was sufficient to return J.B. to her.

Gina Norman testified that J.B., who had no special needs other than mild allergies, had been in her care for three months and was doing well. She said that, if the court terminated appellant's parental rights, she wanted to adopt him.

Appellant's aunt, Linda Murray, testified on behalf of appellant. She said that, since appellant moved in with her and another aunt and some of their nieces, appellant had helped with household chores; had looked for work unsuccessfully; and had worked on her GED. She stated that appellant had informed her that, if J.B. were returned to her, she intended to move into her cousin's two-bedroom apartment in West Memphis; that cousin has two children.

Appellant testified on her own behalf. She denied leaving J.B. with someone she did not know. She denied telling Ms. Brown that she did not know or care where he was, or that someone had taken him. She described the incident in Stuttgart as follows:

[A] boy hit me with a baseball bat and so I was after him and a lady got in my way and I try to stab him instead of the lady and she got in my way, she wouldn't let me go so I stabbed her. And I don't like to be held when I'm mad.

Appellant said that she had improved in her ability to control her behavior and that she had learned alternative ways to deal with her anger. She did not want her parental rights terminated, but admitted that she had no source of income, no job, and no housing of her own. She said that, if the court returned J.B. to her, she did not want to stay with her aunts, because her little sisters were constantly getting into trouble. She described her future housing plans with her pregnant cousin and her two children, stating that "Her mother supposed to move out in January next year and she said I could come and stay with her and when her lease up from her session there we supposed to move to Marion."

Appellant's attorney then stated that, although she had subpoenaed two "fairly important" witnesses, Janet Moody and Theresa Ward, to testify about appellant's "placement and her progress and so forth," they were not present in the courtroom; Moody had appeared, but left after 3:00 p.m. The court stated that it was already 5:30 p.m. and that they would finish the case that day, "So if they're not here we'll go without them."

The court terminated appellant's parental rights on the "twelve months" and "other factors" grounds, citing post-petition issues related to housing, employment, delinquent activity, and current ability to provide for J.B. The court made the following findings:

[J.B.] was placed together with his then minor mother ... in a foster home following her release from DYS commit-

ment. However, the minor mother and child were only able to be placed together for approximately one month in 2006 due to her conduct and disruption of placements. The Court finds that Natasha Blakes had approximately 20 disruptions in placements while in foster care. The record herein is replete with examples of her violent and aggressive behavior, which resulted in those placement disruptions. Natasha Blakes did partially comply with parenting, watched "The Clock Is Ticking" video, and visitation. She received extensive counseling and therapy, primarily while in DYS commitment or while placed through foster care at Pinnacle Point, Bridgeway, Centers, and through outpatient therapy. She failed to avail herself of those services sufficiently to remedy her issues with aggression, violence, and anger management.

The court found clear and convincing evidence that there was a substantial likelihood that the child would be adopted and that DHS was seeking to clear the child for adoption by his current temporary legal custodian. It also stated that there was a significant risk of harm in returning J.B. to appellant because of her "ongoing instability, immaturity, and violent/aggressive behavior as described in the testimony of Doreen Brown. The mother is emotionally and mentally unstable." The court added that, since reaching the age of eighteen, appellant had failed to obtain a job, sufficient income, housing, transportation, or her GED. The termination order was entered on April 30, 2009. Appellant filed a timely notice of appeal.

■ An order forever terminating parental rights must be based on clear and convincing evidence that termination is in the child's best interest. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl.2009). Factors to consider in determining best inter-

est are the likelihood of adoption and potential harm caused by returning the child to the custody of the parent. *Id.* Additionally, DHS must prove at least one statutory ground for termination by clear and convincing evidence. Ark.Code Ann. § 9–27–341(b)(3)(B) (Repl.2009). The purpose of terminating a parent's rights to his or her child is to provide permanency in the child's life where returning the juvenile to the family home is contrary to the child's health, safety, or welfare, and it appears that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective. Ark.Code Ann. § 9–27–341(a)(3) (Repl.2009). We do not reverse a termination order unless the trial court's findings were clearly erroneous. *Meriweather v. Arkansas Dep't of Health & Human Servs.*, 98 Ark. App. 328, 255 S.W.3d 505 (2007).

■ In the present case the trial court found termination of parental rights to be in the best interest of the child, considering the likelihood of adoption and potential harm of continuing contact with the parent. The trial court found that DHS met its burden of proof as to Ark. Code Ann. § 9–27–341(b)(3)(B)(i)(*a*), as follows:

> That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

The court also found that "other factors" had arisen, which appellant did not remedy. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(*a*). By the time the termination order was entered, the child had been in foster care for over three

years. Appellant could not provide any kind of home for him when he was born, and that situation did not sufficiently improve in those three years. The "other factors" ground included appellant's additional acts of violence; her second stay at DYS; and her false report of J.B.'s kidnapping. Although appellant partially complied with the case plan and court orders, her child was clearly in serious danger of abuse if returned to her. The evidence in the record overwhelmingly demonstrates grounds for termination.

The adoptability factor was satisfied by the testimony of Ms. Brown, who said that the child was in a pre-adoptive foster placement, and Gina Norman, who said that she wanted to adopt J.B. Additionally, Ms. Brown's lengthy testimony about appellant's continuing problems controlling her anger satisfied the "potential harm" factor.

Appellant's counsel asserts that the trial court's findings were not clearly erroneous and that there can be no meritorious argument challenging the sufficiency of the evidence to terminate appellant's parental rights. We agree. The evidence demonstrated that the child is likely to be adopted and that his welfare and safety would be jeopardized if returned to his mother's custody. This case has a lengthy history without resulting in a successful reunification, and in the interest of permanency, termination is in the best interest of the child.

DHS adequately proved the statutory grounds as determined by the trial court. There was ample evidence that despite meaningful efforts by DHS, appellant failed to remedy the conditions that caused removal. She has manifested the incapacity or indifference to remedy subsequent issues that arose in this case, which demonstrates that the return to her custody is contrary to the child's welfare. Consistent with the testimony of the caseworker, there is little likelihood that continued services would result in successful reunification. For any and all of these reasons, the trial court was authorized to terminate appellant's parental rights to promote the best interest of the child.

■ Aside from the ruling terminating appellant's parental rights, counsel addresses four adverse rulings. Counsel initially discusses the circuit court's sustaining an objection by DHS's attorney when appellant's counsel asked Ms. Brown on direct examination about her interpretation of statements made by the DHS attorney at the August 8, 2008 staffing. During a discussion of that staffing, appellant's counsel asked what promises were made to appellant, and DHS objected on the ground that the discussion was in the nature of settlement negotiations and, therefore, inadmissible. The line of questioning indicated that appellant might have believed that she had been promised that she would regain custody of J.B. Ms. Brown testified that the attorney made contingent promises to appellant—if she found a job, got her GED, etc.—because appellant had just turned eighteen. In response, DHS's attorney stated that she explained to appellant that she could not promise her anything because she had to advocate for whatever her client recommended; however, this was appellant's last chance to demonstrate that she could change and do better. Because evidence of settlement negotiations are inadmissible under Arkansas Rule of Evidence 408 (2009), and because counsel provided no indication that the evidence was being offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution, we hold that the circuit court correctly ruled on this objection.

■ The next adverse ruling was the circuit court's sustaining an objection by DHS to leading questions asked by appellant's counsel during direct examination of appellant. Appellant testified that, after being released from foster care, she had not received any counseling, although she thought that she needed more anger-management counseling. Her attorney asked, "Now do you sometimes find yourself frustrated for other reasons, I mean do you find that—do you find yourself being distrustful of people or what?" The court sustained the objection by counsel for DHS, and we hold that the circuit court did not abuse its discretion in so ruling. Moreover, the ruling was not prejudicial because appellant was permitted to give the following explanation that her attorney was attempting to elicit:

> When I'm told one thing and then someone does something different it makes me mad. I feel like I can't trust that person. I was told that I would get J.B. back. Then I was told I wasn't going to get him back. That made me feel bad, it made me angry.

In the event appellant's perception was correct, and she was justifiably angry, it would not support a meritorious appeal because such promises did not prompt appellant's previous episodes of physical violence or angry outbursts.

■ On cross-examination by appellant's counsel, the DHS caseworker was asked how many cases she had managed regarding teenage mothers in foster care. The attorney ad litem objected as to the relevance, and the circuit court sustained the objection. Appellant's counsel rephrased the question to specifically ask how many foster children the caseworker had supervised who had displayed aggressive behavior, at which time the attorney ad litem made the same objection. The circuit court directed appellant's counsel to respond as to the relevancy of the question. Counsel responded, "Well, I think it's relevant here as to the type of handling in terms of case management that Natasha would have received as opposed to any other child in a similar situation." The circuit court again sustained the objection, stating, "I think every case is unique and requires personal handling so I'm going to sustain the objection." The circuit court was within its discretion to weigh the relevance of evidence presented and we will not reverse on a question of admissibility of evidence absent an abuse of discretion. *See Stedman v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 805, 2009 WL 4377538. The issue of how many minor mothers the DHS caseworker had managed is irrelevant to the specific, unique actions that appellant took in this particular case. Counsel also notes that no evidence was proffered on this issue. *See Swadley v. Krugler*, 67 Ark. App. 297, 999 S.W.2d 209 (1999) (holding that by failing to proffer to the record the substance of social worker's testimony in regard to any disclosures of sexual abuse of parties' child, mother did not preserve for appellate review issue of whether trial court erred in refusing to qualify social worker as an expert witness, in modification of custody case).

■ Finally, appellant's counsel discusses the circuit court's decision to go forward with the termination-of-parental-rights hearing without appellant's missing witnesses. Appellant's counsel informed the circuit court that she had subpoenaed witnesses, specifically Janet Moody and Theresa Ward, but that the two women left prior to being called to testify. The circuit court inquired as to the substance of their purported testimony, and counsel stated that they would testify regarding the placement and progress of appellant. Counsel stated that she thought the two

witnesses were "fairly important"—at least important enough to subpoena—but she failed to either proffer additional evidence or ask the court for a continuance. Because appellant's counsel did not ask for any relief for the failure of the witnesses to appear, the circuit court decided to proceed with the remainder of the hearing.

The circuit court also inquired as to the notification of the other parties as to the subpoenas, and counsel for appellee and the attorney ad litem appeared to have had no notice. The circuit court noted that the docket sheet did not reflect that any subpoenas had been issued or that there was proof of service. Appellant's counsel indicated that Ms. Ward was personally served and that Ms. Moody was present in court; however, there was no documentary evidence to support counsel's statement. Arkansas Rule of Civil Procedure 45 (2009) provides that notice of a subpoena shall be promptly given to all parties in the manner prescribed by Arkansas Rule of Civil Procedure 5(b) (2009). Rule 5(b) provides that any person subpoenaed for examination at the trial or hearing shall remain in attendance until excused by the party causing him to be subpoenaed. Additionally, Rule 5(b) provides that service upon the attorney shall be made by delivering a copy to the attorney or by sending it to the attorney by regular mail or by commercial delivery, and delivery of a copy means handing the same to the attorney or to the party. Accordingly, the issued subpoenas in question were not properly served, and the parties were not given proper notice. Based upon the sparse evidence before us related to the missing witnesses' proposed testimony, we can discern no basis for a meritorious appeal on this issue.

Based on our review of the record and the brief presented to this court, we conclude that there has been full compliance with Rule 6–9(i)(1) and that the appeal is without merit. Appellant's counsel's motion to be relieved is granted and the termination orders are affirmed.

Affirmed.

HENRY and BROWN, JJ., agree.